**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES,                                      :
:
:
Plaintiff,                    :      17-cr-363 (GBD)
:
-vs-                                :
:
PEDRO GARCIA-PENA,                                  :
:
Defendant.                    :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF
## MOTIONS TO DISMISS THE INDICTMENT AND COMPEL DISCOVERY


Alexander J. Willscher
Corey Omer
Elizabeth V. Young
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendant Pedro Garcia-Pena*


July 27, 2018

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS ..........................................................................................................3

ARGUMENT .............................................................................................................................5

I.      The DEA and ATF's targeting of Mr. Garcia-Pena, and their endless cajoling of him
        to agree to participate in a manufactured crime, violated his Due Process rights. ..............5

II.     A limited pretrial inquiry into the DEA and ATF's selective enforcement of fake
        stash house operations is necessary because, among other things, 97.9% of defendants
        targeted in this District since 2013 are Latino or Black........................................................8

        A.      A limited pretrial inquiry is warranted to evaluate selective enforcement
                claims where there is "any reason to believe that race played a role in the
                investigation." ....................................................................................................10

        B.      That standard is satisfied here because the enforcement of fake stash house
                operations in this District is entirely disproportionate with the racial makeup
                of the District generally and New York City specifically......................................14

III.    The Government has failed to produce evidence relevant to Mr. Garcia-Pena's
        entrapment defense as required under both Rule 16 and *Brady*. .......................................19

IV.     Count Three must be dismissed because conspiracy to commit Hobbs Act robbery
        does not constitute a "crime of violence" under either of Section 924(c)'s two
        definitions. ..........................................................................................................................21

        A.      Conspiracy to commit Hobbs Act robbery does not qualify as a "crime of
                violence" under Section 924(c)'s "risk-of-force" clause because two recent
                Supreme Court cases establish that the clause is unconstitutionally vague...........21

        B.      Conspiracy to commit Hobbs Act robbery does not qualify as a "crime of
                violence" under Section 924(c)'s "force" clause because conspiracies do not
                have as an element the use, attempted use, or threatened use of physical force....25

CONCLUSION...........................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Benitez* v. *U.S.*,
2017 WL 2271504 (S.D. Fla. Apr. 6, 2017) .........................................................................27

*Brown* v. *City of Syracuse*,
673 F.3d 141 (2d Cir. 2012)...........................................................................................10

*Dalton* v. *Ashcroft*,
257 F.3d 200 (2d Cir. 2001)...........................................................................................24

*Davis* v. *Malitzki*,
451 F. App'x 228 (3d Cir. 2011) ....................................................................................10

*Descamps* v. *United States*,
570 U.S. 254 (2013)......................................................................................................25

*Horne* v. *United States*,
2018 WL 1378976 (S.D. Ind. Mar. 19, 2018).................................................................28

*In re Gomez*,
830 F.3d 1225 (11th Cir. 2016) .....................................................................................30

*Johnson* v. *United States*,
135 S. Ct. 2551 (2015)............................................................................................21, 22

*Mathis* v. *United States*,
136 S. Ct. 2243 (2016)...................................................................................................26

*Mobley* v. *U.S.*,
2016 WL 7188296 (S.D. Fla. Dec. 9, 2016)...................................................................29

*Sessions* v. *Dimaya*,
138 S. Ct. 1204 (2018).......................................................................................... *passim*

*Sherman* v. *United States*,
356 U.S. 369 (1958).........................................................................................................1

*Taylor* v. *United States*,
136 S. Ct. 2074 (2016).....................................................................................................8

*Thomas* v. *United States*,
2018 WL 3094936 (E.D.N.Y. June 22, 2018) .................................................................25

## TABLE OF AUTHORITIES
### (Cont'd)

*Thompson* v. *United States*,
2017 WL 6876181 (S.D.N.Y. April 18, 2017) ........................................................................27

*United States* v. *Acosta*,
470 F.3d 132 (2d Cir. 2006)...............................................................23, 24, 25, 29

*United States* v. *Al Kassar*,
660 F.3d 108 (2d Cir. 2011)..............................................................................6

*United States* v. *Alcaraz-Arellano*,
441 F.3d 1252 (10th Cir. 2006) .......................................................................11

*United States* v. *Archer*,
486 F.2d 670 (2d Cir. 1973).............................................................................6

*United States* v. *Armstrong*,
517 U.S. 456 (1996)...........................................................................*passim*

*United States* v. *Baires-Reyes*,
191 F. Supp. 3d 1046 (N.D. Cal. 2016) ........................................................28, 29

*United States* v. *Barlow*,
310 F.3d 1007 (7th Cir. 2002) .........................................................................10

*United States* v. *Bass*,
536 U.S. 862 (2002)........................................................................................10

*United States* v. *Brown*,
299 F. Supp. 3d 976 (N.D. Ill. 2018) .............................................................*passim*

*United States* v. *Black*,
733 F.3d 294, 318 (9th Cir. 2013) ................................................................*passim*

*United States* v. *Chimurenga*,
760 F.2d 400 (2d Cir. 1985)............................................................................29

*United States* v. *Clemente*,
22 F.3d 477 (2d Cir. 1994)..............................................................................26

*United States* v. *Davis*,
793 F.3d 712 (7th Cir. 2015) .......................................................................*passim*

*United States* v. *Desena*,
287 F.3d 170 (2d Cir. 2002)...........................................................................28

*United States* v. *DiSomma*,
951 F.2d 494 (2d Cir. 1991)...........................................................................29

## TABLE OF AUTHORITIES
### (Cont'd)

*United States* v. *Dixon*,
 486 F. Supp. 2d 40 (D.D.C. 2007) ......................................................................11

*United States* v. *Dyman*,
 739 F.2d 762 (2d Cir. 1984).................................................................................6

*United States* v. *Edmundson*,
 153 F. Supp. 3d 857 (S.D. Md. 2015)...............................................................27

*United States* v. *Elder*,
 88 F.3d 127 (2d Cir. 1996).................................................................................28

*United States* v. *Flowers*,
 712 F. App'x. 492 (6th Cir. 2017) ....................................................................8, 9

*United States* v. *Garcia*,
 509 F. App'x. 40 (2d Cir. 2013) .........................................................................27

*United States* v. *Gardner*,
 658 F. Supp. 1573 (W.D. Penn. 1987).................................................................7

*United States* v. *Hare*,
 820 F.3d 93 (4th Cir. 2016) ...............................................................................11

*United States* v. *Hill*,
 832 F.3d 135 (2d Cir. 2016)..........................................................................24, 28

*United States* v. *Hill*,
 890 F.3d 51 (2d Cir. 2018).......................................................................... *passim*

*United States* v. *Jackson*,
 2018 WL 748372 (D. N.M. Feb. 7, 2018) .........................................................18

*United States* v. *Koschtschuk*,
 2011 WL 1549464 (W.D.N.Y. Apr. 22, 2011)...................................................20

*United States* v. *Lal*,
 2018 WL 2222720 (D. Nev. May 15, 2018)........................................................25

*United States* v. *Lamar*,
 2015 WL 4720282 (S.D.N.Y. Aug. 7, 2015)................................................15, 19

*United States* v. *Lard*,
 734 F.2d 1290 (8th Cir. 1984) ..........................................................................6, 7

*United States* v. *Luong*,
 2016 WL 1588495 (E.D. Cal. Apr. 20, 2016).....................................................28

## TABLE OF AUTHORITIES
### (Cont'd)

*United States* v. *McCoy*,
235 F. Supp. 3d 427 (W.D.N.Y. 2017) ...................................................................28

*United States* v. *Mesa-Roche*,
288 F. Supp. 2d 1172 (D. Kan. 2003) ...................................................................13

*United States* v. *Meza*,
2018 WL 2048899 (D. Mont. May 2, 2018) ........................................................28

*United States* v. *Mumphrey*,
193 F. Supp. 3d 1040 (N.D. Cal. 2016) .........................................................11, 18

*United States* v. *Myers*,
692 F.2d 823 (2d Cir. 1982) .................................................................................6

*United States* v. *Patino*,
962 F.2d 263 (2d Cir. 1992) ................................................................................28

*United States* v. *Paxton*,
2014 WL 1648746 (N.D. Ill. Apr. 17, 2014) ...................................12, 13, 16, 17

*United States* v. *Salas*,
889 F.3d 681 (10th Cir. 2018) .............................................................................24

*United States* v. *Santos*,
449 F.3d 93 (2d Cir. 2006)...................................................................................26

*United States* v. *Schmidt*,
105 F.3d 82 (2d Cir. 1997).....................................................................................5

*United States* v. *Stevens*,
985 F.2d 1175 (2d Cir. 1993)...............................................................................20

*United States* v. *Sturdivant*,
244 F.3d 71 (2d Cir. 2001)...................................................................................30

*United States* v. *Tribble*,
320 F. App'x 85 (2d Cir. 2009) .............................................................................6

*United States* v. *Tribble*,
2007 WL 4790651 (E.D.N.Y. Feb. 22, 2007).......................................................6

*United States* v. *Twigg*,
588 F.2d 373 (3d Cir. 1978)...............................................................................6, 7

*United States* v. *Washington*,
869 F.3d 193 (3d Cir. 2017)........................................................................ *passim*

## TABLE OF AUTHORITIES
### (Cont'd)

*Veleff* v. *United States*,
2018 WL 1900491 (N.D. Ill. Apr. 20, 2018) ........................................................27

*Whren* v. *United States*,
517 U.S. 806 (1996).............................................................................................9

**Constitutional Provisions, Statutes, and Rules**

18 U.S.C. § 16(b) ..............................................................................................*passim*

18 U.S.C. § 924..................................................................................................*passim*

18 U.S.C. § 1951 ......................................................................................................3

21 U.S.C. § 841 .......................................................................................................3

Federal Rule of Criminal Procedure 8(a).................................................................30

Federal Rule of Criminal Procedure 16(a)...............................................................20

**Other Authorities**

Howard H. Garrison, *Education and Friendship Choice in Urban Zambia*,
57 Soc. Forces 1310 (1979) ................................................................................18

J. Miller McPherson & Lynn Smith-Lovin, *Homophily in Voluntary
Organizations: Status Distance and the Composition of Face-to-Face
Groups*, 52 Am. Soc. Rev. 370 (1987) ...............................................................18

James Moody, *Race, School Integration, and Friendship Segregation in America*,
107 Am. J. Soc. 679 (2001) .................................................................................18

Katharine Tinto, *Fighting the Stash House Sting*, Champion, (Oct. 2014) ...............9

Luigi Castelli *et al.*, *Implicit Ingroup Metafavortism: Subtle Preference for
Ingroup Members Displaying Ingroup Bias*,
34 Personality & Soc. Psych. Bull. 807 (2008) ..................................................18

Maureen T. Hallinan & Warren N. Kubitschek, *Formation of Intransitive
Friendships*, 69.2 Soc. Forces 505 (1990) .........................................................18

New York City Police Department, *Crime and Enforcement Activity in New York
City (Jan 1 – Dec 31, 2017)* ...............................................................................16

Raymond Fisman *et al.*, *Racial Preferences in Dating*, 75 Rev. Econ.
Stud. 117, 131 (2008)..........................................................................................18

## TABLE OF AUTHORITIES
### (Cont'd)

U.S. Census Bureau, 2016 American Community Survey 5-Year Estimates,
   "Hispanic or Latino Origin by Race," Table B03002.......................................................15, 17

"It is time for these false stash house cases to end and be relegated to the dark corridors of our past.  To put it simply, our criminal justice system should not tolerate false stash house cases in 2018."  *United States* v. *Brown*, 299 F. Supp. 3d 976, 983–84 (N.D. Ill. 2018).

*       *       *

Defendant Pedro Garcia-Pena respectfully submits this memorandum of law in support of his motions:

- to dismiss the Indictment because the conduct of the Drug Enforcement Administration and Bureau of Alcohol, Tobacco, Firearms and Explosives, in manufacturing this fake stash house case, has violated Mr. Garcia-Pena's Fifth Amendment Due Process rights;

- for a limited pretrial inquiry as to whether the DEA and ATF's selective enforcement of fake stash house operations in this District has violated Mr. Garcia-Pena's Fifth Amendment Equal Protection rights;

- to compel the Government to produce specific discovery in the possession of the DEA and ATF that is exculpatory and material to the preparation of Mr. Garcia-Pena's entrapment defense; and

- to dismiss the § 924(c) charge because it is in conflict with recent Supreme Court caselaw and therefore fails to state an offense.

## PRELIMINARY STATEMENT

"The function of law enforcement is the prevention of crime and the apprehension of criminals.  Manifestly, that function does not include the manufacturing of crime."  *Sherman* v. *United States*, 356 U.S. 369, 372 (1958).  Yet, that is exactly what the DEA and ATF did here.

Prior to the involvement of the DEA and ATF, Mr. Garcia-Pena lived a modest and ordinary life.  He had lawfully moved to the United States from the Dominican Republic at the age of 25.  He worked as a cook at a small restaurant on the Upper West Side of Manhattan.  (Affidavit of Pedro Garcia-Pena ("Aff.") at ¶ 3.)  He cared for his young daughter, now three, and often visited his mother, who also lives in New York City.  (Aff. at ¶¶ 3–4.)  He had never been involved in narcotics distribution or robbery, and had never been convicted of a crime.  (*Id.*

at ¶ 5.)   Despite Mr. Garcia-Pena's unassuming lifestyle, the DEA, the ATF, and their confidential informants targeted him for a reverse-sting operation that manufactured a crime and drew Mr. Garcia-Pena from poverty to criminality.   The Government's outrageous conduct in this case, which put a law-abiding person in the business of crime for the first time, violated Mr. Garcia-Pena's Due Process rights, and requires dismissal of the Indictment.

The DEA and ATF's targeting of Mr. Garcia-Pena, a visible minority, for such a fake stash house reverse-sting operation is far from unique.   As is set forth below, Mr. Garcia-Pena proffers ample evidence to support a reasonable inference of discriminatory intent and selective enforcement by the DEA and ATF in connection with fake stash house reverse-sting operations.[1]   Of the at least 144 individuals who were charged in such reverse-sting operations in the Southern District of New York since 2013, all but *one* have been visible minorities, with the overwhelming majority—97.9%—being Latino or Black. That discriminatory effect derives from the DEA and ATF's apparently overwhelming, if not exclusive, use of Latino or Black confidential informants for such operations.   A reasonable inference of discriminatory intent and selective enforcement is further derived from the striking contrast between the racial composition of those that the DEA and ATF target with these operations and the diverse racial composition of:   (i) the Southern District generally; (ii) New York and Bronx counties specifically; (iii) individuals arrested by the New York City Police Department in connection with comparable state-law offenses; and (iv) individuals targeted by reverse-sting operations in another district with a similar racial composition.   Because Mr. Garcia-Pena has proffered evidence strong enough to support a reasonable inference of discriminatory intent and selective

---

[1]   While the target of the robbery discussed during these reverse-sting operations is most often a fictitious stash house, in some instances a different fictitious target is discussed, such as a vehicle.   Accordingly, as used in this brief, references to "fake stash house reverse-sting operations" include reverse-sting operations in which the confidential informant or Government agent suggests or encourages the robbery of any target (not just a stash house) that the confidential informant or Government agent knows to be fictitious.

enforcement, the court can and should conduct a limited pretrial inquiry into the selective enforcement of fake stash house reverse-sting operations by ordering an evidentiary hearing and the production of the discovery set forth in Exhibit A.

In addition, despite repeated defense requests, the Government has produced minimal evidence regarding the early stages of the reverse-sting operation that gave rise to Mr. Garcia-Pena's prosecution.  Specifically, the Government has not produced any documentary evidence—which, upon information and belief, is in the possession of the DEA and ATF—regarding its initial decision to target Mr. Garcia-Pena in 2016 (a year before his eventual arrest) and Mr. Garcia-Pena's alleged involvement in a controlled firearm sale that same year. Such discovery is exculpatory and material to the preparation of Mr. Garcia-Pena's entrapment defense, and must be produced.

Finally, in light of the Supreme Court's recent decision in *Sessions* v. *Dimaya*, 138 S. Ct. 1204 (2018), conspiracy to commit Hobbs Act robbery plainly does not constitute a "crime of violence" within the meaning of 18 U.S.C. § 924(c)(3).  It therefore cannot qualify as a predicate offense for a violation of § 924(c).  Count Three should, therefore, be dismissed.

## STATEMENT OF FACTS

As is true of virtually every fake stash house case, the defendant is charged, in a three-count Indictment, with:  (i) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951; (ii) conspiracy to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); and (iii) unlawful use, carrying, and possession of a firearm, in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Indictment, attached as Ex. A to the Declaration of Corey Omer ("Omer Decl.").)

The Indictment was the result of a year-long reverse-sting operation that the DEA and ATF conducted.  Beginning in early 2016, a former acquaintance of Mr. Garcia-Pena's—

whom Mr. Garcia-Pena knew as "Julio"—called Mr. Garcia-Pena from jail to tell Mr. Garcia-Pena that he desperately needed money to pay for an attorney. Julio said that he owned two guns that he wanted to sell in order to raise money; he was unable to do so, however, because he was incarcerated. Julio asked if Mr. Garcia-Pena would help another individual, "Luna," to sell Julio's two guns. (Aff. at ¶ 6.) Mr. Garcia-Pena considered himself to be indebted to Julio, who had greatly assisted Mr. Garcia-Pena when Mr. Garcia-Pena first immigrated to the United States, so agreed to help him. (*Id.* at ¶ 7.) Unbeknownst to Mr. Garcia-Pena, he had just been lured into a reverse-sting operation. After meeting Julio, Mr. Garcia-Pena was introduced to three other Latino men who, upon information and belief, were working as confidential informants for the DEA and/or ATF. Those three men were (i) "Luna," who was in possession of Julio's two guns; (ii) "Jose," who was the DEA/ATF's main informant and who is identified in the Complaint as "CS-1"; and (iii) "El Viejo," who introduced Mr. Garcia-Pena to Jose. (*Id.* at ¶¶ 6–9.)

Over the course of several weeks in 2016, Jose attempted to establish a relationship with Mr. Garcia-Pena. Jose eventually informed Mr. Garcia-Pena that he had located a purchaser for Julio's firearms. (Aff. at ¶¶ 10–11.) During the subsequent sale, Mr. Garcia-Pena sat in the back of the car while Jose exchanged the firearms for cash. (*Id.* at ¶ 11.) Afterward, Jose called Mr. Garcia-Pena incessantly, but Mr. Garcia-Pena, who felt uneasy about the entire incident, cut off all contact. (*Id.* at ¶ 12.)

In March 2017, Jose called Mr. Garcia-Pena from a new phone number that Mr. Garcia-Pena did not recognize. Jose suggested they rob a home belonging to a narcotics dealer. (Aff. at ¶ 13.) Jose told Mr. Garcia-Pena that no one would be there and that the house would contain a significant amount of cash, which they easily could steal. (*Id.* at ¶ 13.) Over the

next month, through multiple in-person meetings and dozens of phone calls, Jose and a new confidential informant, who purported to be Jose's brother-in-law (and whom the Complaint identifies as "CS-2"), persuaded Mr. Garcia-Pena to participate in a proposed robbery.  (*Id.* at ¶¶ 14–16.)  The details of the robbery changed on several occasions.  Mr. Garcia-Pena repeatedly rebuffed the CIs' proposals and ignored Jose's calls.  Eventually, however, Mr. Garcia-Pena began to capitulate to the CIs' pressure.  (*Id.* at ¶ 14–16.)

Jose insisted that Mr. Garcia-Pena bring guns to the robbery, but Mr. Garcia-Pena did not personally have access to any.  (*Id.* at ¶ 17.)  On April 26, 2017, Mr. Garcia-Pena, Joseph Gabrielle Vallejo, and a third individual were arrested shortly after meeting with the CIs.  Two guns were recovered from the vehicle.  (Compl. ¶ 12.)

## ARGUMENT

**I.     The DEA and ATF's targeting of Mr. Garcia-Pena, and their endless cajoling of him to agree to participate in a manufactured crime, violated his Due Process rights.**

The Due Process Clause of the Fifth Amendment "is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice."  *United States* v. *Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) (citing *Kinsella* v. *United States*, 361 U.S. 234, 246 (1960).  Accordingly, law enforcement conduct in pursuit of a prosecution is barred where it "is 'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused."  *Id.* (quoting *United States* v. *Russell*, 411 U.S. 423, 431–32 (1973)).   In such circumstances—where "the government's involvement in manufacturing crime is demonstrably outrageous"—"the convictions of targeted defendants [should be] set aside."  *Id.*  As the Second Circuit has explained, "there is certainly a limit to allowing governmental involvement in crime," and "[i]t would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather

evidence to convict other members of a gang of hoodlums." *United States* v. *Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973).

A claim of outrageous government conduct is distinct from the defense of entrapment. *See United States* v. *Dyman*, 739 F.2d 762, 768 (2d Cir. 1984). The latter focuses on the predisposition of a defendant to commit a crime. *See United States* v. *Myers*, 692 F.2d 823, 836 (2d Cir. 1982). By contrast, a claim of outrageous government conduct focuses on whether the conduct of law enforcement is "so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *United States* v. *Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011); *see also Myers*, 692 F.2d at 836 ("[D]ue process claim focuses on the conduct of the government agents").

Various courts have held that certain types of reverse-sting operations violate the Due Process Clause where, as here, they "put[] law enforcement authorities in the position of creating *new crime* for the sake of bringing charges against a person they had persuaded to participate in wrongdoing." *United States* v. *Twigg*, 588 F.2d 373, 379 (3d Cir. 1978) (emphasis added).[2] For example, in *United States* v. *Lard*, which the Second Circuit cited with approval in *Schmidt*, 105 F.3d at 91, the Eighth Circuit held that a government agent's conduct in inducing the defendant—who had not engaged in any prior criminal conduct—to sell a pipe bomb was "so outrageous that due process principles should bar the government from invoking judicial processes to obtain a conviction." *Lard*, 734 F.2d 1290, 1296 (8th Cir. 1984). In *Lard*, as here,

---

[2]   In an unpublished, non-precedential "summary order," the Second Circuit determined that the fact that DEA "concocted and executed an elaborate ruse by inviting the defendants to rob a stash house that did not in fact exist" did not amount to outrageous government conduct. *See United States* v. *Tribble*, 320 F. App'x 85, 87–88 (2d Cir. 2009). *Tribble* is not binding and easily distinguishable. The defendant in *Tribble* was alleged to be the "boss" of a "robbery crew[]," and thus—unlike in this case—the DEA did not itself manufacture the *crime* but merely the *opportunity to commit it*. *See* Complaint, *United States* v. *Tribble*, 2007 WL 4790651 ¶¶ 3–4 (E.D.N.Y. Feb. 22, 2007). Moreover, since *Tribble*, courts have recognized the dangers of stash-house reverse stings as well as the need for government restraint. *See infra* p. 8 and note 4.

the government agent both "creat[ed] new crimes for the sake of bringing criminal charges against [the defendant], who, before being induced, was lawfully and peacefully minding his own affairs," and took "rather extreme and questionable measures—including the smoking of marijuana—to gain [the defendant's] confidence and lure him into committing a crime he was not otherwise ready and willing to commit." *Id.* at 1297; *see also Twigg*, 588 F.2d at 381 (involving DEA agents who conceived a drug crime and supplied defendants with the means to accomplish it).   Likewise, in *United States* v. *Gardner*, the court dismissed an indictment charging the defendant with narcotics distribution where, *inter alia*, the defendant—like Mr. Garcia-Pena—(i) had no prior criminal involvement; (ii) the charged offenses "would not have occurred but for the Government's assistance in manufacturing the crime[s]"; and (iii) the confidential agent "persisted over a period of time in inducing and p[e]rsuading the Defendant to commit the crime in question with [the] sole motive and intention of overcoming the obvious reluctance of the Defendant."  658 F. Supp. 1573, 1576–77 (W.D. Pa. 1987).

In this case, the DEA and ATF's conduct in manufacturing crime by targeting Mr. Garcia-Pena violated his Fifth Amendment rights.  While a Government-created "fictional scenario" or "sting operation" will most often not violate the Due Process Clause, it does where, as here, *all* of the pertinent facts necessary for the commission of the offenses charged were either created or suggested by the Government through its agents *and* there is no basis to conclude that—but for the conduct of the DEA and ATF—Mr. Garcia-Pena would have ever set out to commit a robbery of a stash house.  Mr. Garcia-Pena had never been involved in narcotics distribution or robbery and had never been convicted of a crime.  (Aff. at ¶ 5.)  Moreover, the DEA and ATF manufactured each and every aspect of the "stash house" that Mr. Garcia-Pena purportedly agreed to rob.  Among other things, the CIs:

- invented fake stash houses with fictional quantities of narcotics and/or cash;

- approached Mr. Garcia-Pena, an unknowing target, in an effort to lure him into agreeing to rob one of these fake stash houses;

- introduced various ways the CIs and Mr. Garcia-Pena could carry out the proposed robbery; and

- instructed Mr. Garcia-Pena to acquire weapons he did not have.

In such circumstances, the Government has impermissibly created not only the opportunity to commit the crime, but the criminality itself.

In the past year, several courts and judges have recognized that "the potential for abuse and mischief that is endemic to fictitious stash-house stings should not be ignored." *United States* v. *Washington*, 869 F.3d 193, 223 (3d Cir. 2017) (McKee, J., concurring). They have warned that "the concept of these 'stash house sting' operations [is] at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law." *United States* v. *Flowers*, 712 F. App'x. 492, 511 (6th Cir. 2017) (Stranch, J., concurring). And they have called for the end of fake stash house cases. *See Brown*, 299 F. Supp. 3d at 983–84. In many of these cases, courts have concluded that law enforcement agents have toed but not overstepped the line. Here, however, the agents have overstepped and, in so doing, have violated Mr. Garcia-Pena's Due Process rights.[3]

## II.       A limited pretrial inquiry into the DEA and ATF's selective enforcement of fake stash house operations is necessary because, among other things, 97.9% of defendants targeted in this District since 2013 are Latino or Black.

The facts that gave rise to the instant prosecution follow an all-too-familiar pattern in this District: A Latino or Black confidential informant, acting at the direction and

---

[3]       "By targeting a drug dealer [and attempting to rob him], a robber necessarily affects or attempts to affect commerce over which the United States has jurisdiction." *Taylor* v. *United States*, 136 S. Ct. 2074, 2077–78 (2016). Here, however, it is undisputed that there is no connection between the charged offense and any real narcotics or narcotics organization, and therefore there is no basis for federal jurisdiction.

under the supervision of federal law enforcement agents (typically the DEA or ATF), targets an economically disadvantaged, often unsophisticated Latino or Black person—the "direct" target. Over the course of days, weeks, or months, the CI entices that target with the promise of very large amounts of money to rob a fictional stash house belonging to a fictional drug trafficking organization of fictional cash and/or narcotics. (*See, e.g.*, Compl. ¶¶ 9(c), 10(a).) The CI promises that the job will be easy either because no one will be at the stash house or because there is a disgruntled insider who will provide key information or otherwise facilitate the robbery. The confidential informant urges the direct target to recruit other "indirect targets"— who are, virtually always, also Latino or Black—and encourages both the direct and indirect targets to acquire guns to bring to the heist. When the targets meet in advance of the heist, law enforcement swarms onto the scene and arrests them.

As repugnant as fake stash house reverse-sting operations are,[4] the Government is allowed discretion in its authority to enforce and prosecute federal criminal law and, therefore, such operations may be permissible in certain circumstances. The Fifth Amendment, however, "prohibits selective enforcement of the law based on considerations such as race." *Wren* v. *United States*, 517 U.S. 806, 813 (1996).

Upon information and belief, in this District, the DEA and ATF have overwhelmingly and disproportionately used Latino and Black confidential informants to pursue

---

[4]     *See Flowers*, 712 F. App'x at 511 (Stranch, J., concurring) ("These costly and concerning sting operations do not accord with the principles of our criminal justice system and I hope they will be discontinued."); *United States* v. *Black*, 733 F.3d 294, 318 (9th Cir. 2013) (Noonan, J., dissenting) ("The power exercised by the government [in these types of cases] is not only to orchestrate the crime but to control and expand those guilty of it. I do not see how this power can be rationally exercised."); *Brown*, 299 F. Supp. 3d at 986 ("It is unclear to the Court why, with all the tactics available to them, federal law enforcement agents would adopt a narrative tinged with racial overtones to conduct sting operations involving serious federal charges."); *see also, e.g.*, Katharine Tinto, *Fighting the Stash House Sting*, Champion, (Oct. 2014), at 16 ("The recruitment of targets for the stash house sting raises substantial concerns about the criminal culpability of those caught by law enforcement and often raises the question whether these suspects are truly individuals who would have committed such a crime but for the government's involvement and encouragement.").

Latino and Black targets for fake stash house operations, in violation of the Fifth Amendment's Equal Protection Clause.  Because Mr. Garcia-Pena has adduced, at a minimum, "some evidence tending to show the existence of the essential elements of the defense" of selective enforcement, *United States* v. *Armstrong*, 517 U.S. 456, 468 (1996), the Court should compel the Government to produce the discovery set forth in Exhibit A—which the defense requested from the Government on June 15, 2018 (*see* Ex. C to Omer Decl.)—and order an evidentiary hearing.

A.   *A limited pretrial inquiry is warranted to evaluate selective enforcement claims where there is "any reason to believe that race played a role in the investigation."*

In contrast to a selective *prosecution* claim—which is an assertion by the defendant "that the *prosecutor* has brought the charge for reasons forbidden by the Constitution," *Armstrong*, 517 U.S. at 463 (emphasis added)—a selective *enforcement* claim is a "grievance . . . directed solely at [police or agent] misconduct."  *Davis* v. *Malitzki*, 451 F. App'x 228, 234 n.11 (3d Cir. 2011); *see also United States* v. *Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002) ("[Defendant] complains not of selective prosecution, but of racial profiling, a selective law enforcement tactic, . . . [Defendant] contended that the DEA agents had enforced the law selectively by choosing to approach, interview, and search African Americans but not Caucasians, *i.e.*, by engaging in racial profiling.").

To make out a substantive claim of either selective enforcement or selective prosecution, a defendant must "prove[ ] that (1) the [defendant], compared with others similarly situated, was selectively treated," *i.e.*, treated differently from other similarly situated individuals; and "(2) that such selective treatment was based on impermissible considerations such as race." *Brown* v. *City of Syracuse*, 673 F.3d 141, 151–52 (2d Cir. 2012).

Often, however, a criminal defendant will not have access to information that might satisfy such a claim.  In recognition of this information disparity, the Supreme Court in

*Armstrong*, 517 U.S. 456 (1996), and *United States* v. *Bass*, 536 U.S. 862 (2002), propounded a less-rigorous standard for criminal defendants seeking discovery on an anticipated selective *prosecution* claim.  In those cases, the Court held that a defendant need only present "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent."  *Armstrong*, 517 U.S. at 468.

       Neither the Supreme Court nor the Second Circuit has, however, articulated a framework for evaluating the sufficiency of a motion for discovery on a selective *enforcement* claim.  In racial profiling cases, several Circuits have applied the *Armstrong* standard for a claim of selective prosecution.  *United States* v. *Dixon*, 486 F. Supp. 2d 40, 44–45 (D.D.C. 2007) (citing cases); *see also United States* v. *Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[Armstrong's] elements are essentially the same for a selective-enforcement claim.").

       More recently, however, three Courts of Appeals and several district courts have sensibly recognized that, for a number of reasons, the *Armstrong* framework is unworkable in the context of a claim of selective *enforcement*, as opposed to *prosecution*.  *See, e.g.*, *Washington*, 869 F.3d at 213 (3d Cir. 2017) ("[D]istrict judges have more flexibility, outside of the *Armstrong*/*Bass* framework, to permit and manage discovery on claims" of selective enforcement); *United States* v. *Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc) (same); *see also United States* v. *Hare*, 820 F.3d 93, 101 (4th Cir. 2016) (quoting *Davis* with approval and noting that appellant's arguments are "well taken" but concluding that discovery already produced by the ATF was sufficient); *United States* v. *Mumphrey*, 193 F. Supp. 3d 1040, 1048 (N.D. Cal. 2016) (agreeing with reasoning of *Davis*).

       *First*, these courts have recognized that "the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention" that DEA and ATF agents engaged in racial

discrimination when selecting confidential informants or targets for sting operations. That is because, unlike prosecutors, law enforcement agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior." *Davis*, 793 F.3d at 720–21; *cf. Armstrong*, 517 U.S. at 464–65 (referring extensively in formulating framework to, *inter alia*, the "special province of the Executive," the "broad discretion" of "federal prosecutors," "judicial deference to the decisions of . . . executive officers," "a concern not to unnecessarily impair the performance of a core executive constitutional function," and the "presumption of regularity" tied to prosecutorial decisions). Rather, "agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel[,] . . . [and they] may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement that defendants have access to material, exculpatory evidence." *Davis*, 793 F.3d at 720–21. In addition, "[b]efore holding hearings (or civil trials) district judges regularly, and properly, allow discovery into non-privileged aspects of what agents have said or done." *Id.* Thus, "the special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *Armstrong* and *Bass* . . . does not inevitably flow to the actions of law enforcement." *Washington*, 869 F.3d at 219.

*Second*, a defendant has no way of knowing, absent discovery, which informants were available to law enforcement and who else *could have been* but *was not* targeted to participate in an entirely fictional stash house robbery. In support of a claim of selective *prosecution*, a defendant or his attorney may attempt to unearth evidence of discrimination from arrest and other publicly available records. Even the most zealous of advocates pursuing a selective *enforcement* claim, however, cannot review arrest records or reports from reverse-sting operations that never occurred. Indeed, as the Northern District of Illinois explained in *United*

*States* v. *Paxton*, 2014 WL 1648746 (N.D. Ill. Apr. 17, 2014), because fake stash house operations are "wholly dependent on the involvement" of federal law enforcement:  (i) "there is no defined pool of individuals who are charged and subsequently prosecuted differently to whom defendants may compare themselves"; (ii) it is "impossible that defendants would be able to conduct some sort of test operation . . . to determine the practices of the [investigating agency]"; and (iii) "to produce an analogous situation, the defense would have to encourage Caucasian individuals to identify and approach undercover [federal] agents or confidential informants, or somehow gain knowledge of Caucasian individuals who the [government] was already attempting to target."  *Id.* at *5.

Absent a loosening of the *Armstrong* standard, presenting evidence that similarly situated individuals of other races were treated differently would therefore be unreasonably burdensome, if not impossible, virtually eviscerating the defense of selective enforcement.  *See Paxton*, 2014 WL 1648746 at *4 ("In selective enforcement cases . . . identifying the class of individuals [treated differently] . . . may prove insurmountable.");  *see also United States* v. *Mesa-Roche*, 288 F. Supp. 2d 1172, 1186 (D. Kan. 2003) ("In the context of a challenged traffic stop . . . imposing the similarly situated requirement makes the selective enforcement claim impossible to prove.  It would require the defendant to make a credible showing that a similarly situated individual was *not stopped* by the law enforcement.  How could a defendant, *without discovery*, ever make such a showing?") (emphasis in original).

In light of these considerations, the Third Circuit has held that:

[i]f claims of selective law enforcement are raised . . . the standard guiding the district court's discretion is different.  While *Armstrong/Bass* remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows "some evidence" of discriminatory effect.  The proffer must contain reliable

13

> statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions . . . *even if* the underlying challenge is to law enforcement decisions.  Distinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement.  However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

*Washington*, 869 F.3d at 220–21.

The Seventh Circuit reached a similar conclusion.  It held that, if the district court determines on an initial showing by the defendant that there is "any reason to believe that race played a role in the investigation," the court should "proceed in measured steps" and "decide whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred."  *Davis*, 793 F.3d at 722–23; *see also Washington*, 869 F.3d at 221 (endorsing "limited inquiries of the sort recommended in *Davis*," including potentially "the testimony, in person or otherwise, of case agents or supervisors, and the *in camera* analysis of policy statements, manuals, or other agency documents," which can, at the district court's discretion, be disclosed to the defendant).

> B.     *That standard is satisfied here because the enforcement of fake stash house operations in this District is entirely disproportionate with the racial makeup of the District generally and New York City specifically.*

Mr. Garcia-Pena satisfies this burden of proffering evidence that is strong enough to support a reasonable inference of discriminatory intent and non-enforcement.  There have been at least 33 fake stash house reverse-sting operations conducted by the ATF and/or DEA in the Southern District of New York since 2013.  (*See* Ex. D to Omer Decl. (enclosing complaints arising from these operations).)  These operations targeted 144 individuals, 35 directly and 108 indirectly (together, the "Stash House Targets").  Of the Stash House Targets, 143 individuals—

99.3%—are visible minorities and 141—97.9%—are Latino or Black.[5]  (Omer Decl. ¶¶ 9–11.)

Only a *single* Stash House Target is White.  (*Id.*)  This sampling is significantly larger—and

therefore more reliable and probative—than the samples that were presented in the three earlier

Southern District cases that rejected requests for discovery on similar selective enforcement

claims.  *See, e.g.*, *United States* v. *Lamar*, 2015 WL 4720282, at \*16 (S.D.N.Y. Aug. 7, 2015)

(Gardephe, J.) (noting that there were "only nineteen" direct targets in the sample).

      These numbers stand in marked contrast to the racial diversity of the Southern

District of New York, where the Stash House Targets all were prosecuted.  According to the

2016 census estimates, of the residents of New York and Bronx counties, 29.5% are White (non-

Latino), 20.5% are Black (non-Latino), and 39.7% are Latino.[6]  The remaining counties in the

Southern District are less racially diverse, and contain a significantly higher percentage of White

residents than New York and Bronx counties.[7]  Indeed, the racial composition of all counties in

the Southern District is 43.1% White (non-Latino), 16.7% Black (non-Latino), and 31.4%

Latino.[8]

      Likewise, the racial composition of Stash House Targets meaningfully diverges

from NYPD crime and enforcement data regarding individuals arrested in New York City on

felony drug charges (42.7% Black, 40.8% Hispanic, and 12.7% White), arrests involving the

seizure of firearms (65.1% Black, 24.3% Hispanic, 9.7% White), and robbery charges (60.6%

---

[5]      The remaining two visible-minority Stash House Targets are Asian.  (Omer Decl. ¶ 9.)

[6]      *See* U.S. Census Bureau, 2016 American Community Survey 5-Year Estimates, "Hispanic or Latino Origin by Race," Table B03002, *available at* https://factfinder.census.gov/ (viewing Table B03002 for New York County, New York and Bronx County, New York).

[7]      *See id.* (indicating 54.9% – 80.8% of residents identify as White (non-Latino) in Dutchess County, Orange County, Putnam County, Rockland County, Sullivan County, and Westchester County) (viewing Table B03002 for Dutchess County, New York; Orange County, New York; Putnam County, New York; Rockland County, New York; Sullivan County, New York; and Westchester County, New York).

[8]      *See id.* (viewing Table B03002 and aggregating data for New York County, New York; Bronx County, New York; Putnam County, New York; Sullivan County, New York; Dutchess County, New York; Rockland County, New York; Orange County, New York; and Westchtester County, New York).

Black, 31.1% Hispanic, 5.1% White).[9]  There is no reason to think that the pool of individuals available to the DEA and ATF for reverse-sting operations—ostensibly individuals the Government believes are already engaged in related conduct—would be differently composed. Indeed, *Armstrong* expressly suggests that (even on the heightened selective prosecution standard) such state-level data could constitute a credible showing of different treatment of similarly situated persons:  "In the present case, if the claim of selective prosecution were well founded, . . . respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court."  517 U.S. at 470.

Moreover, a comparison between the Stash House Targets and individuals targeted by the DEA and/or ATF for similar fake stash house reverse-sting operations in other districts further evidences the discriminatory conduct of law enforcement in this District.  For example, three courts in the Eastern Division of the Northern District of Illinois permitted defendants to conduct discovery on their selective enforcement claim based on a showing that, during the relevant period, 87.7–90.7% of individuals identified as targets of fake stash-house cases were Black or Latino and 9.2–12.3% were White (non-Latino).  Mot. for Disc., *United States* v. *Davis*, No. 13-cr-63 at 7–8 (N. D. Ill. Sept. 9, 2013) ECF No. 109; Mot. for Disc., *United States* v. *Paxton*, No. 13-cr-103 at 5–6 (N.D. Ill. Jun. 25, 2013) ECF No. 77 ("[F]rom 2006 to the present, the ATF and the U.S. Atty's Office have brought at least 17 phony stash house cases 12 of them targeting all African Americans, totaling 42 African Americans; 3 cases targeting 7 white defendants and 3 cases . . . targeting 8 Latino defendants."); *see also* Mot. for Disc. at 6, *United States* v. *Brown*, No. 13-cr-632 at 6–7 (N.D. Ill. June 10, 2013) ECF No. 123

---

[9]      *See* New York City Police Department, *Crime and Enforcement Activity in New York City (Jan 1 – Dec 31, 2017), available at* https://www1.nyc.gov/assets/nypd/downloads/ pdf/analysis_and_planning/year-end-2017-enforcement-report.pdf.

(citing same statistics as *Paxton*).  The racial composition of Chicago—by far the largest city in the Northern District of Illinois—is very similar to that of New York and Bronx counties (32.3% of Chicago residents identify as White, while 59.7% identify as either Black or Latino).[10]  Unlike in the Northern District of Illinois, however, only *one* of the 144 Stash House Targets in this District—accounting for 0.7% of the targeted population—is White.

Put in perspective, the demographic makeup of the Stash House Targets is not merely unlikely, but patently discriminatory in effect and entirely implausible absent a discriminatory animus on the part of the DEA and ATF:

|  | Southern District | NY & Bronx Counties | NYPD Robbery Arrests | NYPD Felony Drug Arrests | NYPD Firearm Arrests | Reverse-Sting Ops. in N.D. Ill. | **Stash House Targets** |
|---|---|---|---|---|---|---|---|
| Black or Latino | 48% | 60.2% | 91.7% | 83.5% | 89.4% | 87.7–90.7% | **97.9%** |
| White | 43.1% | 29.5% | 5.1% | 12.7% | 9.7% | 9.2–12.3% | **0.7%** |

These disturbing statistics appear to be no accident.  In every fake stash house reverse-sting operation conducted by the DEA and/or ATF in this District since 2015 for which counsel has been able to obtain information concerning the race or ethnic origin of the confidential informant,[11] law enforcement appear to have employed a Black or Latino confidential informant to lure the Stash House Targets.  (Omer Decl. ¶ 12.)  This meaningfully

---

[10]     While the racial composition of the Northern District of Illinois as a whole appears to contain a slightly higher percentage of White residents than the Southern District of New York, *see* U.S. Census Bureau, 2016 American Community Survey 5-Year Estimates, "Hispanic or Latino Origin by Race," Table B03002, *available at* https://factfinder.census.gov/ (viewing Table B03002 for City of Chicago, Illinois) (in the aggregate, racial composition of counties making up Northern District of Illinois is 54.4% White (non-Latino), 16% Black (non-Latino), and 21.4% Latino, as compared to Southern District which is 43.1% White (non-Latino), 16.7% Black (non-Latino), and 31.4% Latino, *supra* note 8 and accompanying text) (viewing Table B03002 for each county comprising the Northern District of Illinois), this distinction pales in comparison to the fact that, based on the statistics presented in the motions for discovery in *Brown*, *Paxton*, and *Davis*, the proportion of White individuals targeted for fake stash house reverse-sting operations in the Northern District of Illinois (12.3%) is over *seventeen times* greater than in the Southern District of New York (0.7%).

[11]     Counsel was able to obtain this information with respect to 10 of the 15 fake stash house reverse sting operations identified for this period.  *See* Omer Decl. Exhibit D, Case Nos. 15-cr-2, 16-cr-717, 16-cr-719, 17-cr-363, 17-cr-602, 17-cr-763, 17-cr-146, 18-cr-327, 18-cr-336, 18-mj-3451.

increased the likelihood that *both* the direct *and* indirect targets of these operations would be Black or Latino.  The principle of "homophily" provides that "contact between similar people occurs at a higher rate than among dissimilar people."  *United States* v. *Jackson*, 2018 WL 748372, at *6 (D. N.M. Feb. 7, 2018) (quoting Miller McPherson, *et al.*, *Birds of a Feather: Homophily in Social Networks*, 27 Ann. Rev. Soc. 415, at 416 (2001)).[12]  Simply put, it suggests that White people are more likely to engage in contact with other White people, Black people with other Black people, and Latino people with other Latino people.  Given that the effects of homophily must have been evident to the DEA and ATF from the *dozens* of these operations they have conducted, their choice to continue overwhelmingly, if not exclusively, using Black and Latino confidential informants strongly implies both discriminatory intent and foreseeable discriminatory impact.[13]

Although the Government is sure to argue that Mr. Garcia-Pena's inability, without any discovery, to conclusively prove a negative—*i.e.*, that White individuals are *not* being targeted by the DEA or ATF—should defeat Mr. Garcia-Pena's motion, such a showing is unrealistic and not required.  Mr. Garcia-Pena has demonstrated that, since 2013, the DEA and ATF have overwhelmingly, if not exclusively, used Black and Latino confidential informants to ensnare Stash House Targets who are 99.3% visible minorities and 97.9% Black or Latino.  He has also shown that these statistics are entirely out of line with the racial makeup of:

---

[12]     *See also*, James Moody, *Race, School Integration, and Friendship Segregation in America*, 107 Am. J. Soc. 679, 680 (2001); Howard H. Garrison, *Education and Friendship Choice in Urban Zambia*, 57 Soc. Forces 1310, 1320 (1979); Luigi Castelli *et al.*, *Implicit Ingroup Metafavortism: Subtle Preference for Ingroup Members Displaying Ingroup Bias*, 34 Personality & Soc. Psychol. Bull. 807, 807 (2008); J. Miller McPherson & Lynn Smith-Lovin, *Homophily in Voluntary Organizations: Status Distance and the Composition of Face-to-Face Groups*, 52 Am. Soc. Rev. 370, 370 (1987); Raymond Fisman *et al.*, *Racial Preferences in Dating*, 75 Rev. Econ. Stud. 117, 131 (2008); Maureen T. Hallinan & Warren N. Kubitschek, *The Formation of Intransitive Friendships*, 69.2 Soc. Forces 505, 507 (1990).

[13] Notwithstanding the use of Latino or Black confidential informants, courts in the Ninth Circuit have acknowledged that such a disproportionate effect on minorities is sufficient to show discriminatory intent. *Mumphrey*, 193 F. Supp. 3d at 1063 ("[T]he fact that 100% of all . . . defendants are African American is probative of discriminatory intent, particularly when the relevant population is not 100% African American.").

- the Southern District of New York generally;
- Manhattan and Bronx counties specifically;
- individuals arrested in connection with comparable state-law offenses by the NYPD;
- individuals targeted by similar reverse-sting operations in the Northern District of Illinois, which has a racial composition similar to this District.

This amounts to more than "some evidence" of selective enforcements, and demands discovery into law enforcement's practices, which have gone without adequate judicial scrutiny for far too long. *See* Order at 1, *Brown*, No. 12-cr-632 (N.D. Ill. July 31, 2013) ECF No. 154 (statistical comparison between racial composition of stash house defendants and demographic makeup of district constituted "strong showing of potential bias in the history of the prosecution of so called 'phony drug stash house rip off cases'" warranting discovery); Order at 2, *Davis*, No. 13-cr-63 (N.D. Ill. Oct. 30, 2013) ECF No. 417 (ordering discovery). In light of this showing, the Court should order an evidentiary hearing and compel the Government to produce the discovery set forth in Exhibit A. *See Lamar*, 2015 WL 4720282, at *3 n.2 (discussing evidentiary hearing); *see also United States* v. *Colon*, No. 3:14-cr-85, Evid. Hr'g, (D. Conn. Sept. 9, 2014) ECF No. 79.

III.     **The Government has failed to produce evidence relevant to Mr. Garcia-Pena's entrapment defense as required under both Rule 16 and *Brady*.**

As noted above, the Government's targeting of Mr. Garcia-Pena began as long as a year before his arrest in March 2017. One of the confidential informants identified in the Complaint befriended Mr. Garcia-Pena and convinced him to participate in an alleged controlled firearm sale in early 2016. (Aff. ¶¶ 9–16.) Materials concerning the Government's earlier employment of confidential informants to target Mr. Garcia-Pena are material to Mr. Garcia-Pena's entrapment defense, and must therefore be disclosed pursuant to Rule 16(a)(1)(E)(i). Thus, the Government has a Rule 16 obligation to produce evidence about the circumstances of

the DEA/ATF investigation that led up to that sale.  *See United States* v. *Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) ("Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or to bolster a defense.").  Indeed, we expect that the Government will seek to introduce evidence of the gun sale as a rebuttal argument to Mr. Garcia-Pena's entrapment defense.

Moreover, the Government has an independent *Brady* obligation to produce evidence about the investigation of Mr. Garcia-Pena in 2016 because, upon reason and belief, it will support his defense that he was targeted and entrapped by the DEA/ATF.  *United States* v. *Koschtschuk*, 2011 WL 1549464, at *2 (W.D.N.Y. Apr. 22, 2011) (finding that, in light of defendant's proffered entrapment defense, certain requested materials, including the confidential informants' cooperation agreements, are exculpatory and material under *Brady*, and ordering their production).

Thus far, however, despite repeated requests from the defense, the *only* evidence the Government has produced regarding this early part of its investigation are two videos of the alleged controlled firearm sale.  (Omer Decl. ¶ 3.)  The Government has not even identified for the defense the date on which the gun sale is alleged to have taken place.

Accordingly, the Court should order the Government to inquire into the existence of, and produce, all discoverable materials concerning:   (i) the circumstances and communications preceding, surrounding, and following the alleged controlled firearm sale; (ii) the investigation that led to the alleged sale; and (iii) the involvement of any confidential informants in the investigation or alleged sale, including in facilitating, encouraging, or executing the sale.  In the event that the Government does not produce such discovery, it should be precluded from introducing evidence of the 2016 gun sale at trial.

IV.     **Count Three must be dismissed because conspiracy to commit Hobbs Act robbery does not constitute a "crime of violence" under either of Section 924(c)'s two definitions.**

Count Three charges Mr. Garcia-Pena with violating 18 U.S.C. § 924(c)(1)(A) by using and carrying a firearm during and in relation to two offenses: (i) "a crime of violence," the conspiracy to commit Hobbs Act robbery charged in Count One; and (ii) "a drug trafficking crime," the narcotics conspiracy charged in Count Two. (Omer Decl. Ex. A at ¶ 5.)

In order to knowingly use and carry a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A), a defendant must commit a predicate "crime of violence." A "crime of violence" is defined in 18 U.S.C. § 924(c)(3) as a felony that either:

- "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or
- "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

The former of these conditions has come to be known as the "force" or "elements" clause, while the latter has come to be known as the "risk-of-force" or "residual" clause.

Conspiracy to commit Hobbs Act robbery does not qualify as a "crime of violence" under either clause, and cannot constitute a predicate to a § 924(c) conviction.

A.     *Conspiracy to commit Hobbs Act robbery does not qualify as a "crime of violence" under Section 924(c)'s "risk-of-force" clause because two recent Supreme Court cases establish that the clause is unconstitutionally vague.*

A statute is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause where it "fails to give ordinary people fair notice of the conduct that it punishes, or is so standardless that it invites arbitrary enforcement." *Johnson*, 135 S. Ct. at 2556. In *Dimaya*, the Supreme Court applied *Johnson* to hold that the "risk-of-force" clause in the

definition of "crime of violence" in 18 U.S.C. § 16(b) is unconstitutionally vague.[14]   Because § 16(b)'s risk-of force clause is *substantively identical* to the risk-of-force clause in 18 U.S.C. § 924(c)(3),[15] *Dimaya*'s reasoning applies equally to § 924(c)(3).   The risk-of-force clause in § 924(c)(3)'s definition of crime of violence is therefore also unconstitutionally vague, and thus cannot be relied upon to sustain a predicate offense.

In *Johnson*, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA"), which contains a definition of "violent felony" similar to the "risk-of-force" clauses of 18 U.S.C. §§ 16 and 924(c),[16] was so vague as to violate due process.   *See* 135 S. Ct. at 2557.   The Court identified two features that "conspire" to make the ACCA's residual clause unconstitutionally vague.   *Id.   First*, the residual clause "leaves grave uncertainty" regarding how to determine the amount of risk a crime poses because, pursuant to the "categorical approach," it ties evaluation of that risk to an imagined "ordinary case," rather than to the particular conduct at issue or to the elements of the offense, and provides no guidance for courts regarding how to identify such an "ordinary case."   *Id.*   at 2557–58.   ("How does one go about deciding what kind of conduct the 'ordinary case' of a crime involves?   A statistical analysis of the state reporter?   A survey?   Expert evidence?   Google?   Gut instinct?").   *Second*, the ACCA's statutory text does not establish how much risk a given "ordinary case" would have

---

[14]       In *Dimaya*, an immigration tribunal determined that the respondent had committed a "crime of violence" within the meaning of 18 U.S.C. § 16(b), which qualifies as an "aggravated felony" under the Immigration and Nationality Act ("INA") and requires "virtual[ly] certain" deportation.   *Dimaya*, 138 S. Ct. at 1211.

[15]       18 U.S.C. § 16(b) defines a "crime of violence" as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."   In relevant part, 18 U.S.C. § 924(c)(3) defines a "crime of violence" as "an offense that is a felony and that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[16]       The "residual clause" of the ACCA defines a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year [that] . . . (ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*."   18 U.S.C. § 924(e)(2)(B) (emphasis added).

to pose before the offense qualifies as a violent felony.  *Id.* at 2558.  The Court concluded that the indeterminacy created by having to determine the "ordinary case" of a crime combined with the indeterminacy of weighing whether that "ordinary case" poses a "serious potential risk" "produces more unpredictability and arbitrariness than the Due Process Clause tolerates."  *Id.*; *see also Dimaya*, 138 S. Ct. at 1213–14.

In *Dimaya*, the Supreme Court held that a "straightforward application" of *Johnson* meant that 18 U.S.C. § 16(b) also violates the Due Process Clause because "§ 16(b) has the same '[t]wo features' that 'conspire[d] to make [ACCA's residual clause] unconstitutionally vague.'"  *Dimaya*, 138 S. Ct. at 1213, 1215.  Specifically, § 16(b) "requires a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk."  *Id.* at 1216.[17]

Section 924(c)(3)(B) likewise shares "the same two features . . . , combined in the same constitutionally problematic way."  *Id.* at 1213.  As with § 16(b), to determine whether an offense is a crime of violence pursuant to the risk-of-force clause of § 924(c)(3), courts, including the Second Circuit, employ the "categorical approach," which focuses on the "intrinsic nature of the offense rather than on the circumstances of the particular crime," *i.e.*, the "ordinary case," in deciding whether that offense qualifies as a "crime of violence."  *United States* v. *Acosta*, 470 F.3d 132, 135 (2d Cir. 2006); *see also United States* v. *Hill*, 890 F.3d 51, 55 (2d Cir. 2018) ("*Hill II*") ("To determine whether an offense is a crime of violence, courts employ what

---

[17]      The Court dismissed any "textual discrepancies" between the ACCA and § 16(b) as "proverbial distinction[s] without a difference."  *Dimaya*, 138 S. Ct. at 1218.  In refusing to credit those small differences, the Court noted Justice Scalia's comment in the last case interpreting the ACCA's residual clause before *Johnson*, "Insanity is doing the same thing over and over again, but expecting different results."  *Id.* at 1223.  In the Court's estimation, continuing to try to reinterpret § 16(b) in a manner consistent with the Constitution would re-start the "lunatic practice" it had abandoned in *Johnson*.  *Id.*

has come to be known as the 'categorical approach.'").[18]  Courts then must hypothesize whether

that "ordinary case" presents a sufficiently high risk of violence.  Indeed, while there are some

differences between the language of the ACCA's residual clause and § 16(b), the latter provision

"contains virtually identical language to § 924(c)(3)."  *Acosta*, 470 F.3d at 134.

While the Second Circuit has, thus far, "express[ed] no view" on whether

§ 924(c)'s risk-of-force clause is void for vagueness pursuant to *Dimaya*, *see Hill II*, 890 F.3d at

53 n.2,[19] the sole Circuit court to have decided the question and a growing number of district

courts have concluded that, because §§ 924(c)(3)(B) and 16(b) have identical statutory texts and

suffer from the same constitutional defects, § 924(c)(3)(B) is also unconstitutionally vague.  *See*

*United States* v. *Salas*, 889 F.3d 681, 686 (10th Cir. 2018) ("*Dimaya*'s reasoning for invalidating

§ 16(b) applies equally to § 924(c)(3)(B)."); *see also, e.g.*, *United States* v. *Birdinground, Jr.*,

2018 WL 3187358, at *4 (D. Mo. June 28, 2018) ("This Court is not able to imagine how

§ 924(c)(3)(B), which is textually identical to § 16(b) and also applied by using categorical

---

[18]     To the extent the Government may argue that § 924(c)'s substantive context renders it distinguishable from § 16 and allows an individualized "underlying conduct" approach focused on the facts of the particular case rather than a "categorical" approach focused on the intrinsic nature of the offense, such an argument is squarely foreclosed by the above-cited Second Circuit precedent.  In fact, in *Leocal*, the Supreme Court specifically analyzed the words "*offense*" and "*by its nature*" and concluded that such "language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime."  543 U.S. at 7 (emphasis in original); *see also Dalton* v. *Ashcroft*, 257 F.3d 200, 204 (2d Cir. 2001) ("Under the language of the statute, a § 16(b) 'crime of violence' is analyzed 'by its nature.'  We believe that this language compels an analysis that is focused on the intrinsic nature of the offense rather than on the factual circumstances surrounding any particular violation.).  Moreover, even assuming that the Second Circuit abrogates its longstanding precedents, ignoring Supreme Court guidance that suggests the opposite approach, and determines that a particularized approach may be applied, Mr. Garcia-Pena's conduct would still not qualify as a crime of violence.  Mr. Garcia-Pena's conduct occurred within the context of a reverse-sting operation that was conceived of, monitored, and controlled by the Government.  Such conduct necessarily does *not* present a "substantial risk" that physical force will be used because, by definition, in reverse-sting operations law enforcement intervenes *before* there is any substantial risk that physical force will be used against the person or property of another.

[19]     Tellingly, however, following *Dimaya*, the Second Circuit amended and superseded its earlier opinion in *United States* v. *Hill*, 832 F.3d 135 (2d Cir. 2016) ("*Hill I*"), *amended and superseded by* 890 F.3d 51 (2d Cir. 2018), to omit its earlier holding that § 924(c)(3)(B) is not void for vagueness.  Indeed, in *Hill I*, the Second Circuit acknowledged that § 16(b) and § 924(c)(3)(B) merit equivalent treatment.  *See* 832 F.3d at 147 (citing to cases interpreting § 16(b) to explain why § 924(c)(3)(B) is comparably distinguishable from the ACCA's residual clause and noting that § 16 "employ[s] the language of § 924(c)(3)(B)").

analysis, could be salvaged."); *United States* v. *Lal*, 2018 WL 2222720, at *1 (D. Nev. May 15, 2018) ("Based on the Court's willingness to expand the reach of *Johnson* to § 16(b) because it too shares the same fatal features the ACCA's residual clause possesses, it follows that *Johnson* must logically apply to § 924(c), to invalidate its identical residual clause."); *Thomas* v. *United States*, 2018 WL 3094936, at *2 n.5 (E.D.N.Y. June 22, 2018) (explaining in *dicta* that "*Dimaya* invalidated § 924(c)'s residual clause as unconstitutionally vague").   As this growing chorus of courts has held, because § 16(b) is unconstitutionally vague, § 924(c)(3)(B) must necessarily also be void for vagueness.

> B.   *Conspiracy to commit Hobbs Act robbery does not qualify as a "crime of violence" under Section 924(c)'s "force" clause because conspiracies do not have as an element the use, attempted use, or threatened use of physical force.*

A court also must apply the categorical approach to determine whether a felony "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" so as to qualify as a "crime of violence" under the force clause, § 924(c)(3)(A).  *See Hill II*, 890 F.3d at 55.

As applied to the force clause, the categorical approach requires the reviewing court to consider whether the "minimum conduct necessary for a conviction of the predicate offense . . . amounts to a crime of violence under § 924(c)(3)(A)."  *Id.* at 56; *see also Acosta*, 470 F.3d at 135.  In so doing, the court must analyze only the statutory definitions—*i.e.*, the elements of the alleged predicate offense—rather than the specific conduct at issue in a case.  *See Descamps* v. *United States*, 570 U.S. 254, 261 (2013); *see also Acosta*, 470 F.3d at 135.  "The reviewing court 'cannot go behind the offense as it was charged to reach [its] own determination as to whether the underlying facts' qualify the offense as, in this case, a crime of violence." *Hill II*, 890 F.3d at 55–56.  Nonetheless, "in employing the categorical approach . . . to show a

predicate conviction is not a crime of violence . . . there must be 'a realistic probability, not a theoretical possibility,' that the statute at issue could be applied to conduct that does not constitute a crime of violence." *Id.* at 56. To demonstrate such a realistic probability, a defendant "'must at least point to his own case or other cases in which the . . . courts in fact did apply the statute in the . . . manner for which he argues.'" *Id.*

Conspiracy to commit Hobbs Act robbery plainly does not have as an element the "use, attempted use, or threatened use" of "physical force against the person or property of another," and therefore cannot qualify as a "crime of violence" pursuant to 924(c)(3)(A). An element of a crime is a "constituent part[] of a crime's legal definition" that the "prosecution must prove to sustain a conviction" and the "jury must find beyond a reasonable doubt to convict the defendant." *Mathis* v. *United States*, 136 S. Ct. 2243, 2248 (2016). Conspiracy does not require either the prosecution to prove or the jury to find that a defendant used, attempted, or threatened physical force. In order to convict a defendant of conspiracy to commit Hobbs Act robbery, the Government must prove only "the existence of a conspiracy to rob" and "knowing participation in that conspiracy." *United States* v. *Santos*, 449 F.3d 93, 97 (2d Cir. 2006). Crucially, "[i]n order to establish a Hobbs Act conspiracy, the government does not have to prove any overt act." *United States* v. *Clemente*, 22 F.3d 477, 480 (2d Cir. 1994). In *Dimaya*, the Supreme Court recognized that, while "conspiracy may be a crime of violence under [the risk-of-force clause] because of the risk of force while the conspiracy is ongoing," the elements of the offense are met "as soon as the participants have made an agreement." 138 S. Ct. at 1219. Thus, a conspiracy cannot qualify as a crime of violence under the force clause.

Moreover, it is indisputable that there is a realistic probability that an individual could be prosecuted for conspiring to commit Hobbs Act robbery without "us[ing], attempt[ing

to] use, or threaten[ing to] use . . . physical force." § 924(c)(3)(A).  Indeed, on the Government's

own theory (and ignoring Mr. Garcia-Pena's applicable defenses), one need look no further than

the present case and similar prosecutions arising from reverse sting-operations to conclude that

such a "realistic probability" exists.  *See also Thompson* v. *United States*, 2017 WL 6876181, at

*1, 3–4 (S.D.N.Y. Apr. 18, 2017) (proof that the defendant "agreed with others to conduct an

armed robbery of people carrying a shipment of cocaine and heroin . . . and that they planned to

rob cocaine and heroin and then sell those drugs" sufficient to support a conviction for Hobbs

Act conspiracy even in absence of attempt or threat to use physical force).[20]

Although the Second Circuit has not yet determined whether conspiracy to

commit Hobbs Act robbery qualifies as a crime of violence under the force clause of § 924(c)(3),

a range of courts have concluded that, like other conspiracies, it does not.  *See, e.g.*, *Veleff* v.

*United States*, 2018 WL 1900491, at *4 (N.D. Ill. Apr. 20, 2018) ("Only two elements are

necessary to prove Hobbs Act conspiracy:  (1) an agreement to commit an unlawful act, and (2)

knowingly and intentionally joining in the agreement.   Neither of these elements categorically

requires the use, threatened use, or attempted use of force."); *Benitez* v. *U.S.*, 2017 WL 2271504,

at *4 (S.D. Fla. Apr. 6, 2017) ("[C]onspiracy to commit Hobbs Act robbery conviction does not

qualify as a crime of violence under [§ 924(c)(3)(A)]."); *United States* v. *Edmundson*, 153 F.

Supp. 3d 857, 859 (S.D. Md. 2015) ("Hobbs Act Conspiracy can be committed even without the

use, attempted use, or threatened use of physical force against the person or property of

---

[20]      Convictions for Hobbs Act conspiracy on a conscious avoidance theory also vividly demonstrate that physical force is not an element of the offense.  In *United States* v. *Garcia*, one of the co-defendants was convicted of Hobbs Act conspiracy where his only conduct involved purchasing a police scanner and a hydraulic pump that were eventually used by others in furtherance of intended Hobbs Act robberies.  Superseding Indictment ¶¶ 2(s) and 2(t), *United States* v. *Garcia*, 509 F. App'x. 40 (2d Cir. 2013); *see also Garcia*, 509 Fed. Appx. at 42.  Defendant was never alleged to be a direct participant in a robbery or an attempted robbery, but the court found that the Government was entitled to rely on the conscious avoidance theory as long as the defendant was aware of a "high probability that the pump would be used for some of the conspiracy's unlawful aims, such as robberies generally."  *Garcia*, 509 Fed. Appx. at 42.

another."); *United States* v. *Luong*, 2016 WL 1588495, at *2 (E.D. Cal. Apr. 20, 2016) ("The jury was . . . not required to find that [the defendant] used, attempted to use, or threatened to use physical force in order to find him guilty of conspiracy."); *United States* v. *Meza*, 2018 WL 2048899, at *4 (D. Mont. May 2, 2018) ("Meza asserts, *and the United States agrees*, that a conspiracy to commit a Hobbs Act robbery does not have, as an element, the use or attempted or threatened use of physical force against the person or property of another.") (emphasis added); *Horne* v. *United States*, 2018 WL 1378976, at *3–4 (S.D. Ind. Mar. 19, 2018); *United States* v. *Baires-Reyes*, 191 F. Supp. 3d 1046, 1053 (N.D. Cal. 2016).

Indeed, while the Second Circuit suggested in *dicta* in its now-superseded opinion in *Hill I* that conspiracy to commit Hobbs Act robbery may constitute a crime of violence, this portion of the opinion is tellingly absent from the amended version of the decision released after *Dimaya* was decided. *Compare Hill I*, 832 F.3d at 140, *with Hill II*, 890 F.3d 51.[21]

Moreover, while, prior to the Supreme Court's decision in *Dimaya*, the Second Circuit determined that Hobbs Act conspiracy and other conspiracies involving an agreement to use physical force constituted crimes of violence for purposes of § 924(c)(1)(A), those decisions relied on the now-void risk-of-force clause. *See, e.g.*, *United States* v. *Patino*, 962 F.2d 263, 267 (2d Cir. 1992) ("[W]hen a conspiracy exists to commit a crime of violence, . . . the conspiracy itself poses a 'substantial risk' of violence, which qualifies it under Section 924(c)(1) and Section 924(c)(3)(B) as a crime of violence."); *United States* v. *Elder*, 88 F.3d 127, 129 (2d Cir. 1996) (relying on *Patino* and utilizing the "substantial risk" language of the risk-of-force clause to classify Hobbs Act conspiracy as a crime of violence); *United States* v. *Desena*, 287 F.3d 170,

---

[21]     While certain district courts have held that conspiracy to commit Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A), those decisions were reached before *Hill I* was amended and superseded, in reliance on a portion of *Hill I* that has been omitted from *Hill II*. *See, e.g.*, *United States* v. *McCoy*, 235 F. Supp. 3d 427, 432 (W.D.N.Y. 2017).

181 (2d Cir. 2002); *Acosta*, 470 F.3d at 136; *see also Mobley* v. *United States*, 2016 WL

7188296, at *4 (S.D. Fla. Dec. 9, 2016), *aff'd*, 697 F. App'x 646 (11th Cir. 2017) (citing *Elder*

and observing that "[w]hile a multitude of courts have held that conspiracy to commit Hobbs Act

robbery qualifies as a crime of violence, those courts have based their holdings on § 924(c)(3)'s

residual clause at subsection (B), rather than the force clause at § 924(c)(3)(A)").[22]

        Significantly, had Congress intended to capture conspiracy in § 924(c)(3)'s force

clause, it could easily have done so by expanding the clause to include "conspiracy to use" or

"intended use" of physical force.  It did not do so, likely because, as one district court has

posited, Congress expected conspiracy to qualify under the risk-of-force clause.  *See Baires-*

*Reyes*, 191 F. Supp. 3d at 1050–51 (noting that "omission of conspiracy" from force clause "is

significant" and that it appears "Congress intended for crimes such as [Hobbs Act conspiracy]—

which involve a substantial *risk* that physical force would be used in the course of committing

the offense—to be covered by the residual clause, not the force clause").  Although, as discussed

above, the risk-of-force clause is unconstitutionally vague under *Johnson* and *Dimaya*, the

statutory text of the force clause may not be judicially remodeled—and stretched to a breaking

point—to avoid the necessary implications of the Supreme Court's decisions and permit Hobbs

Act conspiracy to remain a crime of violence.  *See Jennings* v. *Rodriguez*, 138 S. Ct. 830, 842

(2018) ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as

---

[22]     This Court is also not bound by the vague dictum in *United States* v. *DiSomma*, 951 F. 2d 494 (2d Cir. 1991)—decided within the context of the Bail Reform Act—that conspiracy to commit robbery is a crime of violence because it has as an element the "actual or threatened use of force." *Id.* at 496.  That dictum, which is plainly erroneous as demonstrated above, did not include any analysis pursuant to the categorical approach that § 924(c)(3)(A) requires.  Furthermore, whether Hobbs Act conspiracy constitutes a crime of violence was not contested in *DiSomma* because the parties agreed that it did in light of the Second Circuit's decision in *United States* v. *Chimurenga*, 760 F.2d 400, 403–04 (2d Cir. 1985). *See* Brief for United States, 1991 WL 11015450, at *7.  The *Chimurenga* court, however, relied *exclusively* upon the *risk-of-force* clause—and not the force clause—of the Bail Reform Act in concluding that Hobbs Act conspiracy is a crime of violence. *Id.* at 404.  Indeed, because Hobbs Act conspiracy qualified as a crime of violence under the risk-of-force clause prior to *Johnson* and *Dimaya*, courts—including the *Chimurenga* and *DiSomma* courts—never seriously grappled with whether conspiracy to commit Hobbs Act robbery in fact fits within the force clause.

it pleases.").  Hobbs Act conspiracy cannot qualify as a crime of violence under the force clause.

Because conspiracy to commit Hobbs Act robbery does not qualify as a crime of violence under either the risk-of-force clause or the force clause, it may not serve as a predicate offense for a conviction pursuant to 18 U.S.C. § 924(c)(1)(A).  Accordingly, Count Three fails to state an offense and must be dismissed.[23]

## CONCLUSION

For these reasons, Mr. Garcia-Pena respectfully requests that the Court: (i) dismiss the Indictment because the Government's conduct has violated Mr. Garcia-Pena's Due Process rights; (ii) conduct a limited pretrial inquiry into the selective enforcement of fake stash house reverse-sting operations by ordering an evidentiary hearing and compelling the Government to produce the discovery set forth in Exhibit A; (iii) compel the Government to produce discovery that is material to the preparation of Mr. Garcia-Pena's entrapment defense; and (iv) dismiss Count Three of the Indictment for failure to state an offense.

Dated:     New York, New York               Respectfully submitted,
           July 27, 2018

                                            /s/ Alexander J. Willscher
                                            Alexander J. Willscher
                                            Corey Omer
                                            Elizabeth V. Young
                                            SULLIVAN & CROMWELL LLP
                                            125 Broad Street
                                            New York, New York  10004-2498
                                            Telephone:  (212) 558-4000
                                            Facsimile:  (212) 558-3588

                                            *Attorneys for Defendant Pedro Garcia-Pena*

---

[23]     Count Three also must be dismissed because it is duplicitous in that it prejudicially and impermissibly "combines two or more distinct crimes in a single count," in contravention of Federal Rule of Criminal Procedure 8(a).  *United States* v. *Sturdivant*, 244 F.3d 71, 79 (2d Cir. 2001); *see also In re Gomez*, 830 F.3d 1225, 1227 (11th Cir. 2016) (granting application to file second habeas petition on ground that the § 924(c) count of conviction—predicated on both a drug trafficking offense and a crime of violence—was impermissibly duplicitous).

## Exhibit A

1. A list of all reverse-sting operations involving alleged Hobbs Act robberies of supposedly large narcotics stashes ("Fake Stash Operations") conducted by the New York office of the U.S. Drug Enforcement Agency ("NY DEA") and/or the New York Field Division of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("NY ATF") during the last 10 years, including the name, race, ancestry, and national origin of each individual targeted (whether directly or indirectly) by each such operation; the race, ancestry, and national origin of the confidential informant(s) involved in each such operation; and the case name and docket number of any prosecution that resulted from each such operation;[24]

2. With respect to each of the Fake Stash Operations identified in response to Request No. 1, including but not limited to the operation that targeted Mr. Garcia-Pena, notes, memoranda, or other investigative material sufficient to show how the individuals targeted by the operation were identified and targeted, including in particular, when, how, and the factual basis for why they were identified and targeted;

3. With respect to each of the Fake Stash Operations identified in response to Request No. 1, including but not limited to the operation that targeted Mr. Garcia-Pena, a statement of the known prior criminal investigations, if any, that any law enforcement agency conducted into each defendant before initiating the reverse sting;

4. All NY DEA and NY ATF (or applicable national DEA or ATF) manuals, circulars, or other guidance that discuss "stings," "reverse stings," Fake Stash Operations, "home invasion" investigations, or entrapment operations, including protocols and/or directions to agents and confidential informants regarding how to conduct such operations, how to select confidential informants, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave the conspiracy before an arrest can be made, and how to ensure that agents are not targeting persons for such operations on the basis of their race, ancestry, or national origin;

5. Documents sufficient to show how NY DEA and NY ATF supervisors and managers were to ensure and/or did ensure that their agents were not targeting persons on the basis of their race, ancestry, or national origin for Fake Stash Operations, and what actions those supervisors and managers took to determine whether agents were in fact targeting persons for those reasons; and

6. The number of confidential informants that the NY DEA and NY ATF have used in Fake Stash Operations each year during the last 10 years and the number of those confidential informants who had access to or proposed non-African American or non-Latino persons who could be targeted for a Phony Stash Operation.

---

[24]    To the extent a prosecution followed from a given operation and all information requested in Requests 2 and 3 is contained in a publicly available criminal complaint, reference to the complaint would be a sufficient response.