IAO7GARC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          17 Cr. 363 (GBD)

PEDRO GARCIA PENA,

              Defendant.

------------------------------x
                                    New York, N.Y.
                                    October 24, 2018
                                    12:10 p.m.


Before:
                    HON. GEORGE B. DANIELS

                                    District Judge


                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW PODOLSKY
     Assistant United States Attorney

ALEXANDER WILLSCHER
COREY OMER
ELIZABETH YOUNG
     Attorneys for Defendant

ALSO PRESENT:  Erika de los Rios, Spanish Interpreter
```

IAO7GARC

```
 1                (In open court)

 2                (Case called)

 3                MR. PODOLSKY:  Good afternoon, your Honor.  Matthew

 4     Podolsky for the government.

 5                THE COURT:  Good afternoon.

 6                MR. WILLSCHER:  Hello, your Honor.  Alexander

 7     Willscher, Corey Omer and Elizabeth Young from Sullivan &

 8     Cromwell for Pedro Garcia Pena.

 9                THE COURT:  Good afternoon.  There are outstanding

10     motions.  Mr. Willscher, did you want to address any of the

11     motions.

12                MR. WILLSCHER:  Yes, if I may, I'd like to speak

13     briefly, your Honor.

14                THE COURT:  Yes.

15                MR. WILLSCHER:  Your Honor, we are here in court today

16     because the DEA, and the ATF, and a group of confidential

17     informants manufactured a crime and lured a hard-working but

18     naive man into a conspiracy that was imaginary.

19                The fact pattern here is all too common.  In the past

20     five years a dozen or so different federal judges have issued

21     written opinions sharply criticizing the DEA and the ATF for

22     these types of operations and for continuing to bring them,

23     despite how problematic they are.  We cite many of those

24     judges, and there are cases in our papers, at pages 8 and 9,

25     but really not a month goes by without a new judge commenting
```

1    on this.  So last month, if I may bring up the case, your

2    Honor, this is United States v. Paxton, it's Judge Gettleman

3    from the Northern District of Illinois.  Judge Gettleman

4    writes -- this is a sentencing memo, and he writes right at the

5    beginning that in 24 years on the bench he had never written

6    such a sentencing memo, but he felt compelled to do it here, to

7    express "the Court's disgust with the ATF's conduct in this

8    case."  He writes in the opinion that he fully agrees with the

9    conclusions of other federal judges that these "tawdry and

10   disreputable operations undermine legitimate law enforcement

11   efforts in this country and generate great disrespect for those

12   efforts."  He goes on to say at the end of the opinion, "There

13   is not a question in this Court's mind that none of these

14   defendants would have even thought of engaging in a stash house

15   robbery were it not for the ATF's scheme to entice them into

16   doing so."

17           THE COURT:  But that's the facts as they are alleged

18   here.  The facts as the government has represented is that Mr.

19   Pena had already been involved in similar activity and was the

20   one that suggested this activity in this case -- not this

21   activity but another similar robbery that didn't come to

22   fruition.  And that's the evidence.

23           MR. WILLSCHER:  That's their evidence as stated in the

24   complaint, but their evidence as it's set forth in the

25   discovery they provided is that this confidential informant and

IAO7GARC

1     a group of confidential informants had been targeting

2     Mr. Garcia Pena for many, many months before the alleged

3     communications in the complaint.  He was a target here, and so

4     the facts are the same, your Honor.

5           And Judge Gettleman noted in that opinion that because

6     of the criticism from the bench in Chicago, in 12 different

7     cases the government decided to drop any count of mandatory

8     minimum and allowed all of the defendants across all 12 of

9     those cases just to plead to a Hobbs Act robbery charge

10    carrying no mandatory minimum, and many of those defendants

11    have been sentenced to time served subsequent to that.

12          THE COURT:  But none of them resulted in a dismissal

13    of the indictment.

14          MR. WILLSCHER:  That's correct, your Honor.  We

15    understand on the outrageous government misconduct that it's a

16    very high bar, but our best evidence is the fact that there is

17    a groundswell of support in writing now from these judges

18    throughout the country and from the media, the defense bar,

19    members of the public.  And you wouldn't know that at all from

20    the government's papers; they don't comment on any of those

21    cases.  Instead, at page 8 of the brief the government

22    describes this practice, this investigatory practice, as

23    eminently reasonable.

24          And if you read between the lines of the government's

25    brief, what that says is at least here in the Southern District

IAO7GARC

1     of New York these cases are going to continue to be brought --

2     despite all the obvious problems with them -- unless and until

3     the bench says enough is enough.

4              THE COURT:  Well, I think the critical question is:

5     Is this the appropriate case for that review?  If the evidence

6     would indicate that the defendant was already predisposed and

7     had engaged in similar activity in the past and had suggested

8     this kind of activity to the confidential informant.

9              MR. WILLSCHER:  It's an excellent point, your Honor.

10    So let's talk about the evidence of predisposition or really

11    the lack of it.

12             This defendant has never been convicted before.  There

13    is no conviction for a drug crime.  There is no conviction for

14    robbery, for arms possession, there is none of that here.

15    There is no allegation that he was a ringleader of some gang

16    that does Hobbs Act robberies routinely and this was just a

17    matter of the ATF needing to get him on his tenth robbery.

18    This is not that case.

19             What this case is is the CI's targeted him because one

20    of the CIs knew him back when he was living in the Dominican

21    Republic.  And it's not a huge community of Dominicans in New

22    York City, and so he was targeted by a CI who needed to make a

23    case in order to get out from a criminal sentence himself.

24             THE COURT:  Well, how does that make it outrageous

25    government conduct?

1          MR. WILLSCHER:  It's outrageous because he is an

2     innocent man, hard working, he has a job, he has a baby at home

3     he is trying to support, he is working in a restaurant in the

4     Upper West Side.

5          THE COURT:  But, as I say, that's a different set of

6     facts than the government is representing.  Are there tape

7     recordings in this case of a conversation?

8          MR. WILLSCHER:  Yes, absolutely.

9          THE COURT:  And are those conversations consistent

10    with or inconsistent with his prior activity?

11         MR. WILLSCHER:  They are consistent with our version

12    of events.  And, to be clear, if the case isn't dismissed,

13    Mr. Garcia Pena is fully committed to trying this case on an

14    entrapment defense, so that's how strongly he and we feel about

15    the evidence here.

16         The only thing I expect the government to get up and

17    talk about is that a year before the arrest Mr. Garcia Pena is

18    on video in the back of a car while someone in the front of a

19    car is selling a gun.  And that is what is point three in our

20    papers here, is that we made it very clear to the government

21    that if we have to go to trial, we're going to, we're going to

22    raise an entrapment defense; and today the only evidence about

23    any event that the government has given us are those two

24    videotapes, and last night the government sent over a PDF that

25    someone had filed a police report that their gun had been

1    stolen.

2         But, again, we don't even know the date of the

3    incident, much less any of the details about who the

4    confidential informants were, what the circumstances of that

5    case were.  And we have been very clear and transparent that

6    we're raising the entrapment defense.  The government claims

7    that they're working on it, but, you know, we have had this

8    request out for months now, for eight months or more, and so

9    far we've gotten pretty much zilch on that point.

10         THE COURT:  A request for what?

11         MR. WILLSCHER:  For any evidence about the -- the sole

12    evidence the government will have of predisposition, which is

13    that he was present when there when a gun sale happened.  And

14    we want the details around that, because clearly it was video

15    recorded.  It was an ATF operation, they had someone wearing a

16    wire -- it was a confidential informant -- and they've given us

17    nothing about that.  And it's our testimony again that he was

18    targeted to be in that car and lured into the car.  And he

19    wasn't comfortable, he didn't feel comfortable being there, and

20    that's why for the next six months or eight months he ceases

21    contact with the confidential informant.

22         THE COURT:  Is this the same confidential informant or

23    a different confidential informant?

24         MR. WILLSCHER:  We don't know, the government won't

25    tell us.  But, your Honor, Mr. Garcia Pena ceased contact.  And

1    when the CI called him back in connection with the new robbery

2    that's in the complaint, he didn't have that CI's phone number

3    any longer.  Besides not having any desire to get in touch with

4    the CI, he had no means to get in touch with him.

5         So, the government's claim in its papers and in the

6    complaint that Mr. Garcia Pena was the impetus of this

7    operation, it can't be right.  And that's why you know we've

8    asked for phone records, we've gotten the phone records, and we

9    will be able to show that.

10        THE COURT:  So, on what basis can I conclude that you

11   have met a threshold showing here?  Even if those issues are in

12   dispute, that doesn't give me a basis to conclude that there is

13   evidence of outrageous conduct or targeting the defendant

14   because of his race or any other illegitimate reason.

15        MR. WILLSCHER:  Let me come to the race in just a

16   minute.  You can dismiss this indictment without getting to any

17   of the selective enforcement issues.  And on the outrageous

18   government conduct, there are two cases we cite in our brief --

19   a Third Circuit case, Twigg, and an Eighth Circuit case,

20   Laard -- and I concede these are old cases, but the line they

21   draw, and the way that they're different than subsequent Second

22   Circuit cases and Southern District cases is that not only in

23   those cases did the government create the opportunity for the

24   defendant to get into trouble, but they actually manufactured

25   the crime itself.  And so every other one of the cases that the

9

IAO7GARC

government cites is not our case.  We have a much more

attractive case because here everything was made up; it was all

imaginary.  The robbery, the drugs, the guns, he didn't have

any of that.  He was just put up to it by the government, and

we also don't have the predisposition evidence at all.

So, we are fully aware that this is a very heavy

burden to meet on the outrageous government conduct, and, you

know, I frankly will concede that that I think is why you have

a dozen federal judges instead of dismissing those indictments

they are instead sending written messages to the government

that these cases are beneath the dignity of the DEA and the

ATF, and you should stop bringing them in this district, and at

least in Chicago and out in California the government has

gotten that message.  And here that hasn't happened yet, and

they're going to keep coming.

You know, in our papers here we say just in the last

three years there have been at least 15 more of these cases

that we know of.  And I will come to the racial aspect in a

minute, but they're all targeting very discrete racial

minorities.  And it's not anything about the U.S. Attorney's

office, but I don't see any supervision coming from the U.S.

Attorney's office about these cases.  I think they're reactive.

An ATF agent shows up one day and says I just arrested five

people, let's bring them to court, and the government then does

that.  OK?  And so there is not any kind of high-level policy

IAO7GARC

1    decision being made by the government in this District about

2    the concerns that all of these federal judges have expressed

3    about these kinds of cases, and it's time for that, it really

4    is.

5              So let me turn to the selective enforcement.  Again,

6    the government in its papers, it just asserts that the Supreme

7    Court's decision in Armstrong is the standard that needs to be

8    met here, and respectively that's just not correct.

9              You have decisions now from the Third Circuit in

10   Washington, from the Seventh Circuit in Davis.  And the Fourth

11   Circuit, while it didn't need to really articulate the issue,

12   they cited in the Hare opinion, they cited the Davis and

13   Washington standards favorably.

14             So, in all those cases those courts and other district

15   courts recognize that the Armstrong standard is really

16   impossible to meet in this situation where you are alleging

17   selective enforcement as opposed to selective prosecution.  So,

18   what they've said is we're not going to give the defendants

19   just carte blanche to start a massive discovery campaign;

20   instead what we're going to acknowledge is that district courts

21   ought to have the ability to look into this if the government

22   is not going to be paying attention itself, and there ought to

23   be some limited discovery and we will go in baby steps; we will

24   start off with a certain discrete category of discovery, and

25   that has been granted.  Contrary to the government's papers,

IAO7GARC

1    there have been discovery orders issued in Chicago, in

2    Philadelphia, out in San Francisco, on selective enforcement

3    claims.  So, there is a road map here for the Court in terms of

4    what is that appropriate first step to do.  OK?  And that's set

5    forth in our Exhibit A, and we can cite you to the other court

6    opinions that have granted -- or the orders that have granted

7    that discovery.

8          But there is a road map here for how we go about

9    looking into this.  And the Second Circuit has not had the

10   opportunity to decide whether Armstrong is the right standard

11   to apply to a selective enforcement case.  And respectfully I

12   think that once it does, it will follow the reasoning of all of

13   these courts, including the Third, the Seventh and the Fourth

14   circuits, that it makes sense to have a bit more forgiving bar

15   in a case of selective enforcement.

16         And here, your Honor, the government cites -- again

17   it's just whistling past a graveyard.  It cites to several

18   cases from three or four years ago that have denied selective

19   enforcement cases.  And the implication from that is because,

20   you know, back in 2014 a different judge in this court

21   dismissed it, we know this is OK, we don't need to look at it

22   or worry about it.  But you do.  I mean the most recent judge

23   to have thought about this or issue an opinion on it prior to

24   today was Judge Gardephe in 2015.  And this was just after the

25   Davis case came out of the Seventh Circuit; it was before the

IAO7GARC

1    Washington case was issued; so he didn't have the benefit of

2    those court's reasoning.  But, more importantly, since that

3    time 15 more of these cases have been brought, and since that

4    time I think all of them have been with the two minority groups

5    that we talked about in our papers.

6              So, it's getting worse, it's not getting better, and

7    so it's not enough just to say, well, we looked at precedent

8    here and Judge Gardephe when he thought about it in 2015 didn't

9    think there was enough, so therefore we can just rely on that.

10   The fact is it keeps on getting worse and worse.  The law is

11   changing.  More and more federal judges are recognizing that

12   this is a major problem, and now there is a road map out there

13   for how we can all as officers of the court be looking into

14   this in a responsible and respectful way.

15             And one other thing about some of those other cases.

16   Besides the Judge Gardephe case, many of the other cases the

17   government cites where they dismissed the selective enforcement

18   point, those were cases where the defendant -- they weren't

19   able to make the showing that we did here.

20             Our client, we are fortunate that over the summer we

21   had lots and lots of lawyers who spent hundreds of hours

22   studying all of these cases in the last several years in this

23   district.  And ordinary lawyer, a member of the CJA panel, is

24   not going to have the resources to do that, to conduct that

25   inquiry.  And Mr. Omer set forth all the work that went into it

IAO7GARC

1    in his declaration.  It's a massive undertaking, but we have

2    been prepared to do it.  We're able to do it.

3         And it's no accident that in Chicago, where this has

4    really been the other place that has been the epicenter of this

5    impact litigation, it's because the University of Chicago Law

6    School has really been dedicating a huge amount of time and

7    resources into looking into it.  And, not surprisingly, when

8    they did that, and when the bench out there -- nine different

9    district court judges held an evidentiary hearing on this point

10   out there, because they all had these case, and they were all

11   very concerned, and the result at the end of the day was the

12   U.S. Attorney just pled all those cases out and for the most

13   part those defendants got time served.

14        And I'm willing to guarantee that the U.S. Attorney's

15   office is not going to be bringing any more of these fake stash

16   house cases any time in the future out there.

17        THE COURT:  Let me hear from the government.

18        MR. PODOLSKY:  Thank you, your Honor.  Let me respond

19   to a few points, and I will try to be brief, because I know

20   you're familiar with the briefing.

21        But let me start with this.  I understand that people

22   disagree about whether the government should be engaged in

23   sting operations of any kind or of this particular kind, and

24   that's a fine policy debate to have, but that's not why we're

25   here in court today.

IAO7GARC

1          We're here in court today because this defendant was

2     charged with showing up to a proposed robbery with firearms.

3     That's what this is about.  This isn't an opportunity for

4     impact litigation.  This isn't an opportunity for defense

5     counsel to make a plea that the government should change its

6     enforcement policies.  That's just not why we're here.

7          And we can go back to first principles about this.

8     The question is has the defense made a showing sufficient to

9     get discovery into the government's other operations and

10    enforcement principles so that they can make a claim of

11    selective enforcement.  And we can talk about outrageous

12    government conduct separately as well.  And the answer is no.

13    And it's clearly no, because there must be some evidence --

14    there must be some showing of discriminatory intent that

15    affected this defendant's case.  The cases are very clear on

16    that.  Even in the Seventh Circuit -- which the defense relies

17    on -- that is what Davis says.  You don't just get to throw off

18    some statistics and say it appears that minorities are involved

19    in more cases than others, therefore you get discovery into the

20    government's practices.

21          Judge Gardephe explains very clearly in Lamar

22    recently.  And frankly, your Honor, although the defense keeps

23    pointing to the groundswell of oppositions by judges across the

24    country to the practice of sting operations, when you actually

25    look at the law, these exact claims have been brought

IAO7GARC

1    repeatedly in this District.  Lamar, that was Judge Gardephe;

2    Viera, Judge Ramos; Delacruz, Judge Forrest; Thompson, Judge

3    Nathan, each of those cases the judges considered these exact

4    set of claims, and denied them because the law does not permit

5    dismissal on this type of outrageous government conduct claim.

6    That's clear from the Second Circuit.  There are multiple cases

7    addressing this directly that are cited in our brief.  And this

8    kind of showing is not sufficient to get discovery into a

9    selective enforcement claim.

10           And I will just mention, your Honor, that about eight

11   months ago you considered these exact same claims in a case

12   involving a defendant Pierre.  Although that case the defendant

13   did plead guilty before your Honor issued an actual order or

14   opinion on the issue, in a February conference in that case you

15   indicated your inclination not to dismiss.  In fact, my

16   understanding was you made it fairly clear you were not going

17   to dismiss the indictment based on those claims, and in that

18   case it did proceed to a guilty plea.  These are not new

19   claims.  The courts have repeatedly rejected them because the

20   law just does not support them.

21           Let me just quickly go to where your Honor went, first

22   of all, with defense counsel, which is is this case even

23   appropriate for these kinds of claims at all.  And the answer

24   is it isn't.  Despite repeated assertions in the defendant's

25   briefing, and in today, and in court today that this just is

IAO7GARC

1  the exact same as every other stash house robbery, the record

2  shows this is just not the case where there is any arguable

3  basis for claiming there was any kind of discriminatory effect

4  or intent.

5         And how do we know that?  Well, let's look at the

6  sworn complaint.  We can look at the defendant's own affidavit,

7  which is just full of speculation and mischaracterization of

8  facts.  And I'm also happy to proffer a few facts about the

9  history of the CS in this case, which I think your Honor asked

10 about a few moments ago.

11        As defense counsel noted, there is sort of a case

12 prior to this case which involved the sale of firearms from the

13 defendant to the CS in this case.  Despite the defendant's rank

14 speculation in his affidavit, there wasn't some huge conspiracy

15 of multiple CSs passing him from one to the other.  Somehow he

16 thinks the government had three or four different undercover

17 individuals trying to target him.  I have spoken to the agents

18 on the case.  It's just not accurate.  The actual facts are

19 that the CS in this case was somebody working with HSI -- not

20 the DEA or ATF -- was introduced to Mr. Garcia Pena.

21 Mr. Garcia Pena said he wanted to sell some firearms.  I

22 believe the defendant's own affidavit acknowledges that a

23 friend of his asked him to sell the firearm.  At that time it

24 was one of ATF's purposes and missions to take illegal firearms

25 off the street, so HSI contacted ATF, who arranged to purchase

1    these firearms and take them off the street.  They did.  It was

2    video recorded.  We have handed over those video recordings to

3    the defense counsel.  And that was the defendant in this case

4    selling firearms of his own volition and own interests to

5    someone he did not know was a government informant.

6            Now, the case would have ended there; he wasn't

7    charged.  ATF simply took the guns off the street, and that was

8    it.  But that wasn't enough for Mr. Garcia Pena.  As is put

9    forth in the sworn complaint, he then contacted and spoke with

10   the CS again about robberies and in fact proposed his own

11   robbery, an actual robbery.

12           And I can tell you that this investigation, this

13   targeting began, DEA was brought in because they understood

14   that Mr. Garcia Pena actually wanted to carry out an armed

15   robbery, he wanted the CS to be a driver, and the government

16   could not allow that to happen.

17           Now, when that robbery fell through, when that didn't

18   happen, knowing Mr. Garcia Pena had spoken about a specific

19   crime as well as other potential crimes he was interested in

20   with the CS, the government at that point did choose to engage

21   in the sting operation, because that was the safest way to

22   prevent Mr. Garcia Pena from engaging in this kind of violent

23   conduct that might actually endanger the safety of the

24   community.

25           Now, Mr. Garcia Pena puts in his affidavit -- his only

IAO7GARC

1   reference to those discussions are that during the course of

2   his conversations he may have been boasting.  Well, that's not

3   going to be the testimony at trial.  But let's even assume

4   that's the case.  Let's assume for the moment that he was

5   boasting about how much he wanted to commit crimes, about how

6   he wanted to commit a stash house robbery, about how he wanted

7   the CS to help him with that.  That still doesn't amount to

8   outrageous government conduct or selective enforcement, because

9   it was the law enforcement's understanding that he did want to

10   engage in those activities and that he was proposing them.

11        And actually let me make one other point about why

12   this record is different than others.  Look at the complaint.

13   The defense has dug up -- and I understand there is a lot of

14   work -- they dug up dozens of complaints on stash house robbery

15   cases from this District, and you will note that in almost all

16   of them the way the conduct starts is a CS reports that he is

17   aware of someone who has in the past engaged in armed robberies

18   or he has heard wants to, or might be involved with a crew.

19        There is nothing wrong with those cases, and I am not

20   suggesting that there would be a cause for any discovery into

21   those cases.  But this case is different.  The sworn complaint

22   in this case is exactly as I've laid it out, that Mr. Garcia

23   Pena, who had previously sold guns to an informant, then

24   proposed additional robberies.  He wasn't targeted.  This

25   wasn't the DEA out there fishing, trying to find someone to fit

1    a profile.  This was someone who came to a government informant

2    and sought out violent criminal conduct.

3            This is not an appropriate case for either a claim of

4    outrageous government conduct, nor is it an appropriate case

5    for a selective enforcement claim, even if -- even if there was

6    going to be some softer than Armstrong standard applied.

7            Very, very quickly on that point on the law, every

8    court as far as I'm he aware in this District to consider these

9    claims have applied the Armstrong standard.  That is the clear

10   law in this District.  But even if -- even if you were to look

11   at the way that the other circuits that defense counsel cites

12   approach this question, the circuits do not say, district

13   court, you must go and order discovery in these cases.  What

14   they say is if there is indicia, if the defense has some basis

15   to conclude that there is discriminatory intent above the

16   statistics, then you may -- you have the discretion to proceed

17   with discovery.  That is what Davis says very, very clearly.

18   That's the Seventh Circuit case.  In case defense counsel had

19   proffered that they had additional evidence of discriminatory

20   intent as applied to that defendant, and the circuit said,

21   district court, you are permitted receive that proffer, receive

22   that evidence and choose whether to take additional steps.

23   That is simply not the case here.

24           So, under any standard that applies, this is not the

25   case for a selective enforcement claim; it's not the case for

IAO7GARC

1    an outrageous government conduct claim.

2              THE COURT:  Yes, sir.

3              MR. WILLSCHER:  Briefly, your Honor.  I will mainly

4    respond to the law, because with due respect to the assistant,

5    there were some I think errors in describing the law.  He began

6    by saying that the standard is that there must be some evidence

7    of discriminatory intent.  And I mean if he is right that

8    Armstrong applies in the Second Circuit, then that is maybe the

9    test, but the Second Circuit has never held that; it's an open

10   question here in the Circuit.  And if you read the Washington

11   case from the Third Circuit, just to be clear, it says distinct

12   from what is required under Armstrong, a defendant need not at

13   the initial stage -- which is where we are -- provide some

14   evidence of discriminatory intent, or show that on the effect

15   prong similarly situated persons of a different race or equal

16   protection classification were not arrested or investigated by

17   law enforcement.  However, the proffer must be strong enough to

18   support a reasonable inference of discriminatory intent and

19   nonenforcement.

20             We have met that burden in spades here.  The assistant

21   just said statistics are not enough, you need more.  That's not

22   true.  What else can we possibly have at this point when the

23   government -- even though the ATF has given discovery in a

24   whole bunch of other districts around the country, this

25   government isn't giving it to us.  We have done all we possibly

IAO7GARC

1    can to make that showing.  So, the government is setting an

2    impossible bar for us.  Statistics are enough.  They were

3    enough in Davis, they were enough in Washington, they have been

4    enough out in the Northern District of California.  Those were

5    enough in all of those cases.  So, we have met that standard

6    here clearly.

7         Now, the other thing the prosecutor said was that this

8    is not the right vehicle because Mr. Garcia Pena initiated the

9    conduct.  And at the start of my remarks I told you why

10   factually that's not right.  But let's focus on the law for the

11   minute.  That very point was raised by the government both in

12   Davis and in Washington, and in both those cases the Third

13   Circuit and the Seventh Circuit rejected the argument.  I am

14   quoting now from the Washington opinion at page 222.  The court

15   writes, "The government emphasizes that they did not actually

16   select or target any of the defendants, suggesting that a

17   selective enforcement claim is categorically forestalled.  This

18   argument was raised in and rejected by Davis.  We agree with

19   the Seventh Circuit that although Berry himself initiated

20   matters by asking the informant for robbery opportunities and

21   then chose his own comrades, it remains possible that the

22   government would not have pursued the investigation had he been

23   white."

24        So this argument about the vehicle that the prosecutor

25   is saying, it's been rejected by two courts of appeals in the

1   country, and in both those cases discovery had been granted.

2            And in terms of burden on the government here, for the

3   most part they can start meeting the burden just by calling up

4   their colleagues in the other districts and gathering what was

5   produced from the ATF there in terms of policy handbooks from

6   the ATF, how ATF is recruiting confidential informants.

7            I am on the CJA panel.  I have all kinds of clients

8   who are being signed up as confidential informants, and I have

9   never had a white one who has been suggested that he go try to

10  do fake stash house robberies.

11           So, it's important for us to know how the DEA is

12  thinking about using confidential informants, how are they

13  recruiting them.  Once they have them, where are they putting

14  them to work, on what kind of operations?  And we know from

15  these other cases is that evidence has been produced to

16  defendants.  It's under seal unfortunately, so we don't have

17  it, but that's not burdensome at all for the government to

18  give.  And then the government has demographic information

19  about its other defendants in these cases; it also has

20  demographic information about the confidential informants.

21  There is no way that they will share that with us absent a

22  court order, but it's central part of our selective enforcement

23  claim, that if in all of these cases, these fake stash house

24  robbery cases, they're only using Dominican or Latino or black

25  confidential informants, you know, due to various principles

IAO7GARC

1   that are recognized in academic and legal literature, you are

2   almost guaranteed to get defendants from just those racial

3   groups.

4            THE COURT:  But, again, why is this case that case?

5   Why doesn't the prior sale of firearms that he was involved in

6   preclude that argument in this case?

7            MR. WILLSCHER:  Well, because as Davis and Washington

8   said, even if the government is right -- which the government

9   is not right -- it doesn't matter, because the case might not

10  have --

11           THE COURT:  What is not right?  I don't understand

12  what you claim -- I don't hear you saying that he wasn't

13  involved in a previous sale.

14           MR. WILLSCHER:  I am saying that.  But our argument,

15  our understanding is that he was set up for that.  This is the

16  first time today -- despite eight months of asking the

17  prosecutor for evidence about the gun sale -- and suddenly when

18  his back is against the wall the government finally shares with

19  us that there is an informant from a different agency -- not

20  ATF.  You know, we don't know anything about the identity of

21  that person, the circumstances of how that person came to know

22  Mr. Garcia Pena.  But it's our client, and he said in his

23  affidavit he believes he was targeted by that confidential

24  informant.

25           It's no different.  And we just have our hands tied

IAO7GARC

behind our back in responding to that because the government

refuses to give us any of that evidence.  And it's Brady

evidence because it's exculpatory; it's also material to our

defense, so it's Rule 16.

And the best they say in their papers -- they spent

half a page addressing that argument, and essentially what they

say is we're working on it.

THE COURT:  Yes?

MR. PODOLSKY:  Your Honor, I will just respond very,

very briefly to just one or two points.

One, on the law, if your Honor hasn't already, we

invite you to read the cases in both briefs.  I think the cases

are clear.  Davis says this is a case where -- this is a

Seventh Circuit case, the government says, look, the defendant

in that case initiated and said he was interested in robberies,

and what the court says is the defendants contend that they

have additional evidence beyond that presented to district

court that could support such a conclusion.  What the court

says is, OK, if the defense actually has evidence -- referring

to the conclusion that that person was targeted based on race,

not based on the fact that he was interested in doing crimes --

then the defense can come forward with it.

Even accepting that Davis is the right standard --

which it's not; it's never been adopted by any court in this

District -- it still isn't right here, because there is

IAO7GARC

1    absolutely nothing -- nothing that the defense has been able to

2    come forward with that would lead to a reasonable inference

3    that race had any part in the selection of Mr. Garcia Pena as a

4    defendant.

5            And in fact this case is different than the facts in

6    Davis or in Washington, because this is a case where Mr. Garcia

7    Pena himself, he didn't just say, oh, I'm somebody who is

8    interested in robberies; he actually approached a CS and sold

9    him guns.  He then approached the CS again and said I would

10   like to carry out a robbery with you, an actual robbery, and

11   began planning it.  That's contained in the sworn complaint.

12   It's also reflected, at least the first part of the story --

13   you can understand it even from Mr. Garcia Pena's own

14   affidavit, as long as you take away his pure speculation that

15   everyone else he had met in between all of his friends and the

16   CS in this case was also a CS, which is just purely speculation

17   by Mr. Garcia Pena.  There is simply no basis for it.

18           And frankly, your Honor, the defense has mentioned

19   that it's no burden to the government.  I'm not quite sure on

20   what basis they are asserting that, but burden isn't the

21   standard here in any case.

22           And the defense keeps making assertions that the

23   government hasn't produced this, hasn't produced that.  Well,

24   the defense is not entitled to, among other things, prior

25   statements of potential witnesses.  They're not entitled to

IAO7GARC

1  know the entire background of potential witnesses in this case.

2  And, in fact, it is far from the norm -- in fact it's the norm

3  in this case -- to preclude defense from getting information

4  about the identity of cooperators or CSs in advance of trial.

5  The government has turned over all Rule 16 material, and in

6  fact has provided additional information beyond what is

7  required by Rule 16.

8          So there is simply no basis in this case -- frankly in

9  any of these case -- as prior decisions of other judges in this

10  district have made -- but particularly in this case there is

11  simply no basis to entertain these claims.

12          THE COURT:  Is there any other aspect of your motions

13  that is still outstanding that needs to be addressed?

14          MR. PODOLSKY:  Your Honor, there is additionally a

15  claim regarding the 924(c) count related to the Hobbs Act

16  conspiracy.  That's clearly been answered by the Second Circuit

17  in Barret, so I think there is nothing else to say about that.

18          THE COURT:  You are not pursuing that any further

19  beyond that?

20          MR. WILLSCHER:  Your Honor, I would just ask, as the

21  government did before Barrett that you hold your decision on

22  that in abeyance.  The defendant filed a motion on Monday for

23  an en banc hearing, and with respect to that Second Circuit

24  panel, that decision is in conflict with five other circuits,

25  with prior Second Circuit case law and with the Supreme Court's

IAO7GARC

1   decision in Dimaya.  So I don't know that I would take Barrett

2   to the bank at this moment.

3           THE COURT:  All right.  Let me take it.  I'm going to

4   give you a short written decision on this.  I think what I will

5   do is I will schedule a pretrial conference.  What else needs

6   to be done once I decide this motion, if I deny the motion,

7   other than setting a trial date?

8           MR. PODOLSKY:  I think just a trial date and maybe a

9   schedule for in limine motions and other deadlines.

10          THE COURT:  All right.  So then let me do this.  Let's

11  schedule a pretrial conference for January 9 at 10 o'clock.  I

12  will give you a decision in the next few weeks or days on this,

13  and then we can start talking to each other about whether or

14  not there is going to be a trial if it's not dismissed, or if I

15  don't grant discovery.  And we can talk on January 9 about a

16  trial date.  Otherwise, I will let you know whether or not I'm

17  going to grant the motion and/or order further discovery on

18  this issue.

19          All right, so January 9 at 10 o'clock.

20          MR. PODOLSKY:  Your Honor, I know that there is a

21  motion pending, but I would also move to exclude time under the

22  speedy trial clock so we can continue any discussions with

23  defense counsel and begin our preparations for trial.

24          THE COURT:  Any objection?

25          MR. WILLSCHER:  No, your Honor.

IAO7GARC

1            THE COURT:  I will exclude the time, motions still

2    pending.  I will exclude the time until January 9th.

3            MR. PODOLSKY:  Thank you, your Honor.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25