UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
UNITED STATES OF AMERICA,

    -against-

PEDRO GARCIA-PENA,

    Defendant.
------------------------------------- x

MEMORANDUM DECISION
AND ORDER

17 Crim. 363 (GBD)

GEORGE B. DANIELS, United States District Judge:

    On June 8, 2017, Defendant Pedro Garcia-Pena was indicted on charges of conspiracy to commit Hobbs Act robbery, conspiracy to distribute and possess with intent to distribute cocaine, and possession of a firearm in furtherance of a crime of violence. (*See* Indictment, ECF No. 10.) Defendant moves to dismiss the Indictment and compel the government to produce discovery. (ECF No. 37.) Defendant's motion is DENIED.

### I.     FACTUAL BACKGROUND

    The allegations in the criminal complaint filed against Defendant are based, in part, on information from a confidential source ("CS-1"). (Compl., ECF No. 1, ¶ 6.) In his affidavit, Defendant states that he believes CS-1 to be "Jose," a man he became friends with through a mutual acquaintance. (Affidavit of Pedro Garcia-Pena dated July 24, 2018 ("Garcia-Pena Aff."), ECF No. 40, ¶¶ 9–10.) In 2016, Jose told Defendant he knew someone willing to buy two firearms that Defendant had agreed to sell for a friend. (*Id.* ¶ 6.) Defendant sat in the car while Jose exchanged the firearms for cash. (*Id.* ¶ 11.) Defendant asserts that after the firearm sale, he "cut off all contact with Jose." (*Id.* ¶ 12.) In his affidavit, Defendant asserts that Jose called Defendant in 2017 and "started talking about a potential robbery and suggested that [Defendant] get involved." (Garcia-Pena Aff. ¶ 13.)

The criminal complaint alleges that on March 23, 2017, Defendant asked CS-1 to serve as a driver in a home invasion robbery in the Bronx. (Compl. ¶ 7(a).) Defendant told CS-1 that two other co-conspirators would be involved, that the robbers would be armed, and that the purpose of the robbery was to steal narcotics. (*Id.* ¶¶ 6(b), 7(b).)

The criminal complaint also alleges that on March 27, 2017, Defendant met CS-1 in person to discuss the robbery. (Compl. ¶ 8.) Defendant said he had a "source" who would provide him with a three-hour window during which the robbery could be executed. (*Id.* ¶ 8(a).) Defendant also asked CS-1 to serve as a driver for another robbery in Connecticut. (*Id.* ¶ 8(c).)

On April 3, 2017, Defendant had a second meeting with CS-1, in which Defendant said he had not heard anything further from his "source" and that he believed the "source" had been arrested. (*Id.* ¶ 9(a).) Defendant also stated that if CS-1 knew of anyone who needed a murder-for-hire, he would be willing to carry it out. (*Id.* ¶ 9(b).) At the direction of law enforcement, CS-1 stated that he was aware of a drug-trafficking organization in New York City that he and Defendant could rob. (*Id.* ¶ 9(c).) Defendant stated that he was willing to carry out the robbery, and would do so alone if necessary. (*Id.*)

The criminal complaint also alleges that CS-1 introduced Defendant to another confidential source ("CS-2") by telephone. (*Id.* ¶ 9(d).) In his affidavit, Defendant states that he believes CS-2 is a man introduced to him as Jose's brother-in-law. (Garcia-Pena Aff. ¶ 14.) Defendant further states that Jose and Jose's brother-in-law "repeatedly encouraged [Defendant] to participate in a robbery," and admits that he eventually "capitulate[d] to Jose's and his brother-in-law's pressure." (*Id.* ¶ 15.)

According to the criminal complaint, on April 5, 2017, CS-1 and CS-2 met with Defendant in the Bronx and CS-2 proposed a robbery of armed narcotics dealers. (Compl. ¶ 10(a).)

Defendant stated that he could provide a vehicle, firearms, and uniforms that resembled police uniforms. (*Id.* ¶¶ 10(b)–(c).) On April 25, 2017, CS-1, CS-2, and Defendant met again and discussed the details of the robbery. (*Id.* ¶ 11.) In his affidavit, Defendant states that, in discussions with Jose and Jose's brother-in-law, Defendant "at times pretended to have access to a gun or have experience in crime" but "only said these things to fit in . . . and because Jose told [Defendant] that [Defendant] needed to impress his brother-in-law." (Garcia-Pena Aff. ¶ 16.)

The criminal complaint further alleges that on April 26, 2017, CS-1 and Defendant spoke by telephone several times, and Defendant answered affirmatively when asked if he wanted to carry out the robbery CS-2 had proposed. (Compl. ¶ 12(a).) CS-1 told Defendant to meet him at a location in Manhattan. (*Id.*) Defendant does not directly address these allegations in his affidavit, but admits that he "met with Jose and his brother-in-law" on that date. (Garcia-Pena Aff. ¶ 18.)

According to the criminal complaint, when Defendant arrived at the meeting place, CS-1 spoke with Defendant and another individual in Defendant's car, who confirmed that they were prepared to carry out the robbery. (Compl. ¶ 12(c).) CS-1 told Defendant to follow CS-1's car to the robbery location, and Defendant did so. (*Id.*) Shortly thereafter, law enforcement pulled over Defendant's car and found a loaded revolver and a handgun in the trunk. (*Id.* ¶ 12(d)(ii).) Defendant was arrested and subsequently indicted. (*See* Minute Entry dated Apr. 26, 2017; Indictment; *see also* Garcia-Pena Aff. ¶ 18.)

Defendant moves to: (1) dismiss the Indictment; (2) conduct an inquiry into whether the Drug Enforcement Administration ("DEA") and Bureau of Alcohol, Tobacco, and Firearms, and Explosives ("ATF") selectively enforce the law in conducting "fake stash house reverse-sting operations"; and (3) compel production of evidence regarding the government's "initial decision

to target Mr. Garcia-Pena in 2016 . . . and Mr. Garcia-Pena's alleged involvement in a controlled firearm sale that same year." (Mem. in Supp. of Mot. to Dismiss ("Mem."), ECF No. 39, at 2–3.)

## II.  DISMISSAL OF THE INDICTMENT IS NOT WARRANTED

### A.  Defendant Has Not Shown Outrageous Government Conduct

The Second Circuit has noted that "government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (citation omitted). However, "[t]he Second Circuit has never found a violation of due process based on the government's outrageous conduct, and has described the claim as 'an issue frequently raised that seldom succeeds.'" *United States v. Gomez*, 83 F. Supp. 3d 489, 492 (S.D.N.Y. 2014) (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)); *see also United States v. Schreiber*, No. 15 Crim. 377 (ENV), 2018 WL 276347, at *3 (E.D.N.Y. Jan. 3, 2018) ("The Second Circuit has never found that the government's involvement in a crime was so outrageous as to violate due process under any set of facts.") (citation omitted).

A defendant seeking to establish such a due process violation bears a "'very heavy' burden in light of [the Second Circuit's] 'well-established deference to the [g]overnment's choice of investigatory methods.'" *Al Kassar*, 660 F.3d at 121 (quoting *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999)). "Generally, to be outrageous, the government's involvement in a crime must involve either coercion or a violation of the defendant's person." *United States v. Crawford*, 714 F. App'x 27, 30 (2d Cir. 2017) (citation and internal quotation marks omitted). "[I]t is not enough to 'show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive.'" *United States v. Gill*, 674 F. App'x 56, 58 (2d Cir. 2017) (quoting *Al Kassar*, 660 F.3d at 121).

In *United States v. Tribble*, "[a]lthough the DEA concocted and executed an elaborate ruse by inviting the defendants to rob a stash house that did not in fact exist," the Second Circuit found that "such conduct does not rise to the level of being 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused.'" 320 F. App'x 85, 87 (2d Cir. 2009) (quoting *Schmidt*, 105 F.3d at 91); *see also Gill*, 674 F. App'x at 58 ("[T]he mere fact that the government used a sting operation is insufficient to show that the government 'exceed[ed] due process limits.'") (quoting *United States v. Cromtie*, 727 F.3d 194, 219 (2d Cir. 2013)); *see also United States v. LaPorta*, 46 F.3d 152, 159 (2d Cir. 1994) ("Time and again . . . we have upheld convictions stemming from sting operations.").

Courts in this district have also found that "fake stash house" operations do not rise to the level of "outrageous" government conduct. *See Gomez*, 83 F. Supp. 3d at 492 (finding allegations of an "entirely fake stash-house scheme" that was "manufactured" by the government, and that the government "preyed on [the defendant] because he is poor" and "had a small child" were insufficient to "sustain a claim of outrageous government conduct"); *United States v. Borrero*, No. 13 Crim. 58 (KBF), 2014 WL 5493241, at *3 (S.D.N.Y. Oct. 30, 2014) (finding no outrageous government conduct where defendant argued that he had "never been convicted of a crime like the instant fictitious robbery," that the "government had no suspicion of [defendant] before the reverse sting operation," that the government "made up a crime that enticed all of the defendants to get involved" and "was deeply involved in the offense," and that "but for the government, no crime existed"). Because Defendant has not shown that the government engaged in outrageous conduct, dismissal of the Indictment on that basis is not warranted.

### B.     Hobbs Act Robbery is a "Crime of Violence"

Defendant argues that regardless of whether the government has engaged in outrageous conduct, Count Three of the Indictment, which charges him with possession of a firearm in furtherance of a "crime of violence" in violation of 18 U.S.C. § 924(c), should be dismissed. (Mem. at 21–30.) However, Defendant's argument is premised on his assertion that "[c]onspiracy to commit Hobbs Act robbery does not qualify as a 'crime of violence' . . . and cannot constitute a predicate to a § 924(c) conviction."[1] (*Id.* at 21.) After Defendant's motion was filed, the Second Circuit issued its decision in *United States v. Barrett*, which held that a "Hobbs Act robbery conspiracy" is a "categorical crime of violence" for purposes of § 924(c). 903 F.3d 166, 185 (2d Cir. 2018). In light of *Barrett*, Defendant's argument that Count Three should be dismissed is without merit.[2]

### III.    DEFENDANT'S EVIDENTIARY REQUESTS ARE DENIED

### A.     Defendant is Not Entitled to Discovery on His Selective Enforcement Claim

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). "To prevail on a claim of selective enforcement,' plaintiffs must demonstrate: '(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on

---

[1] Although the Indictment alleges that the cocaine conspiracy also constitutes a "crime of violence," (Indictment ¶ 5), the Second Circuit has held that "narcotics offenses do not constitute crimes of violence within the meaning of § 924(c)." *United States v. Diaz*, 778 F.3d 86, 88 (2d Cir. 1985).

[2] At oral argument, defense counsel requested that this Court hold its decision in abeyance pending the Second Circuit's decision on a petition for rehearing *en banc* in *Barrett*. Defense counsel's request is denied.

6

impermissible considerations such as race . . . .'"[3] *Telian v. Town of Delhi*, 709 F. App'x 79, 81 (2d Cir. 2018) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).

In *United States v. Armstrong*, the United States Supreme Court held that a defendant seeking discovery on a selective *prosecution* claim must provide "some evidence tending to show the existence of . . . [1] discriminatory effect and [2] discriminatory intent." 517 U.S. at 468 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)) (internal quotation marks omitted). "To establish a discriminatory effect . . . , the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* at 465. Although neither the Supreme Court nor the Second Circuit "have articulated a framework for evaluating the sufficiency of a motion for . . . discovery on a selective enforcement claim . . . , other Circuits have . . . applied the standard set forth" in *Armstrong*. *United States v. Dixon*, 486 F. Supp. 2d 40, 45 (D.D.C. 2007) (collecting cases).

Several courts in this district have also applied the *Armstrong* standard to selective enforcement claims. *See Lamar*, 2015 WL 4720282, at *5 ("[A] defendant seeking discovery on a selective enforcement claim must meet the same ordinary equal protection standards that *Armstrong* outlines for selective prosecution claims.") (footnote and citation omitted); *see also United States v. Viera*, No. 14 Crim. 83 (ER), 2015 WL 3833797, at *2 n.4 (S.D.N.Y. June 19, 2015) (same); *United States v. Delacruz*, No. 14 Crim. 815 (KBF), 2015 WL 2211943, at *4 (applying *Armstrong* to selective enforcement claim); *United States v. Thompson*, No. 13 Crim.

---

[3] A selective enforcement claim differs from a selective prosecution claim. "A selective prosecution claim is . . . an . . . assertion that the prosecutor has brought [a] charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). By contrast, a selective enforcement claim is "directed solely at [police or agent] misconduct." *United States v. Lamar*, No. 14 Crim. 726 (PGG), 2015 WL 4720282, at *4 (S.D.N.Y. Aug. 7, 2015) (quoting *Davis v. Malitzki*, 451 F. App'x 228, 234 n.11 (3d Cir. 2011)) (alteration in original).

7

378 (AJN), 2013 WL 6246489, at *5 (S.D.N.Y. Dec. 3, 2013) (same). Indeed, Defendant has not cited any case in the Second Circuit applying a standard other than *Armstrong*.

However, Defendant asserts that courts in other circuits have "recognized that . . . the *Armstrong* framework is unworkable in the context of a claim of selective *enforcement*, as opposed to *prosecution*." (Mem. at 11.) In particular, Defendant notes that in *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017), the Third Circuit stated that "a district court retains the discretion to conduct a limited pretrial inquiry into [a] challenged law-enforcement practice on a proffer that shows 'some evidence' of discriminatory effect" if the proffer is "strong enough to support a reasonable inference of discriminatory intent and non-enforcement." (Mem. at 13–14 (quoting *Washington*, 869 F.3d at 220–21)

Defendant also cites *United States v. Davis*, in which the Seventh Circuit reversed the grant of a discovery order and directed the district court to "proceed in measured steps," beginning with "the question [of] whether there is any reason to believe that race played a role in the investigation." 793 F.3d 712, 722 (7th Cir. 2015); (*see also* Mem. at 14 (quoting same)). The defendants claimed to have evidence that "the FBI and ATF would not have pursued this investigation had [the named defendant] been white." *Davis*, 793 F.3d at 722. The Seventh Circuit directed the district court to "receive this evidence and then decide whether to make limited inquiries . . . to determine whether forbidden selectivity occurred or plausibly could have occurred." *Id.*

Regardless of whether this Court applies the principles articulated in *Armstrong*, *Washington*, or *Davis*, Defendant has failed to make the showing necessary to obtain discovery.[4]

---

[4] After oral argument, Plaintiff wrote to inform this Court of the Ninth Circuit's decision in *United States v. Sellers*, 908 F.3d 848 (9th Cir. 2018), in which the Ninth Circuit held that "*Armstrong*'s rigorous discovery standard for selective prosecution claims does not apply strictly to discovery requests in selective enforcement claims . . . ." (Letter from Alexander J. Willscher to this Court dated November 6, 2018, ECF

Defendant argues that he has shown evidence "strong enough to support a reasonable inference of discriminatory intent and non-enforcement" because he has provided evidence of thirty-three "fake stash house reverse-sting operations" conducted in this district by the DEA and/or ATF since 2013 which targeted 144 individuals, only one of whom was white. (Mem. at 13–14.) Defendant asserts that, based on census data, the racial makeup of this sample of "Stash House Targets" is in "marked contrast to the racial diversity of the Southern District of New York." (*Id.* at 14.) Defendant also asserts that "the racial composition of Stash House Targets meaningfully diverges from NYPD crime and law enforcement data regarding individuals arrested in New York City on felony drug charges, . . . arrests involving the seizure of firearms, . . . and robbery charges." (*Id.*) Defendant argues that this statistical evidence demonstrates that the "demographic makeup of the Stash House Targets is not merely unlikely, but patently discriminatory in effect and entirely implausible absent a discriminatory animus on the part of the DEA and ATF." (*Id.* at 17.) But such statistical evidence alone cannot meet the *Armstrong* standards.

The statistics that Defendant cites cannot constitute evidence of discriminatory effect because they do not demonstrate that "similarly situated individuals of a different race were not [targeted]" in sting operations. *See Armstrong*, 517 U.S. at 465 (study showing that all of the drug cases closed by the Federal Public Defender's Office in 1991 involved a black defendant did not provide evidence of discriminatory effect because it "failed to identify individuals who were not

---

No. 50 (quoting *Sellers*, 906 F.3d at 855.) However, the Ninth Circuit noted that a defendant "must have *something* more than mere speculation to be entitled to discovery." *Sellers*, 906 F.3d at 855. In *Sellers*, the defendant's proffer was not limited to statistical evidence; the ATF agent who "set up" the operation at issue in his case also testified about that operation, and other stash house reverse-sting operations in which he was the primary undercover agent that resulted in indictments of people of color. *Id.* at 850–51; *see also* Appellant's Excerpt of Record, Vol. 2, *United States v. Sellers*, No. 16-50061, ECF No. 26-2, at 171:14–173:5. Here, Defendant has offered nothing more than "mere speculation" as to the discriminatory intent of the officers in his case and, as such, also fails to meet the discovery standard articulated in *Sellers*. *Id.* at 855.

9

black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted").

Defendant argues that "because fake stash house operations are 'wholly dependent on the involvement of federal law enforcement,' . . . presenting evidence that similarly situated individuals of other races were treated differently would . . . be unreasonably burdensome, if not impossible." (Mem. at 12 (citation omitted).) In support of this argument, Defendant relies upon *United States v. Paxton*, in which an Illinois district court found the defendants "proffered statistics sufficient to meet the 'some evidence' requirement" to show discriminatory effect and intent. *United States v. Paxton*, No. 13 Crim. 103 (RWG), 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014); (*see also* Mem. at 13 (citing same)). However, other courts in this district have rejected similar arguments. *See Viera*, 2015 WL 3833797, at *2 (rejecting defendants' argument that "statistics . . . showing that the Southern District of New York is 'predominantly white' and that 'white people also commit crimes' but that the individuals targeted in 'phony stash house' [cases] in this district are all people of color[] sufficiently shows 'some evidence' of discriminatory effect and intent to warrant discovery");

Moreover, while *Paxton* purports to follow the "*Armstrong* standard for discriminatory effect," the *Paxton* court did not require the defendants to "generate information about similarly situated Caucasian individuals." *Paxton*, 2014 WL 1648746, at *5. Thus, *Paxton* appears to be inconsistent with *Armstrong*'s requirement that "[t]o establish discriminatory effect," a defendant "must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. Here, because Defendant has not produced evidence that the Stash House Targets he identifies were "treated differently from another similarly situated class," his "statistics do not

constitute 'some evidence' of discriminatory effect under the *Armstrong* standard." *Lamar*, 2015 WL 4720282, at *11.

To the extent that *Paxton* applies a standard for proving a discriminatory effect that differs from the one in *Armstrong*, Defendant has not identified any court in this circuit that has followed *Paxton*. In fact, courts in this district and elsewhere have expressly declined to do so. *See id.* at *12 (finding *Paxton* "not . . . persuasive" and noting that it "does not properly apply the *Armstrong* standard[]"); *Viera*, 2015 WL 3833797, at *3 (finding that the fact that "it may be impossible to identify situations where white individuals were not prosecuted . . . does not justify relieving [d]efendants altogether of the burden to show similarly situated defendants of other races were treated differently") (quoting *United States v. Whitfield*, 29 F. Supp. 3d 503, 514 (E.D. Pa. 2014)) (internal quotation marks omitted); *United States v. Colon*, 71 F. Supp. 3d 269, 283 & n.8 (D. Conn. 2014) (declining to follow "stash-house sting cases from the Northern District of Illinois" that were not "consistent with *Armstrong* . . . to the extent that defendants have not introduced comparator evidence"); *United States v. Cousins*, No. 12 Crim. 865 (AJS), 2014 WL 5023485, at *5 n.3 (N.D. Ill. Oct. 7, 2014) (declining to follow *Paxton* in light of the Seventh Circuit's holding in *Chavez v. Illinois State Police* that statistics may not serve as the "'sole proof' of discrimination") (quoting *Chavez*, 251 F.3d 612, 645 (7th Cir. 2001)).

Even if statistics could provide evidence of discriminatory effect, *Armstrong* also requires proof of discriminatory intent. *See Armstrong*, 517 U.S. at 470. Neither the Supreme Court nor the Second Circuit has directly addressed "what showing of discriminatory intent suffice[s] to support discovery" in the context of selective prosecution or selective enforcement claims. *United States v. Alameh*, 341 F.3d 167, 174 (2d Cir. 2003). However, in *McClesky v. Kemp*, the Supreme Court stated that, for purposes of an Equal Protection Clause claim, a claimant "must prove that

11

the decisionmakers in *his* case acted with discriminatory purpose." 481 U.S. 279, 292 (1987). Courts in this district and elsewhere have required a similar showing to support an inference of discriminatory intent in the context of selective enforcement claims. *See Lamar*, 2015 WL 4720282, at *6 ("[T]o establish the discriminatory intent element in support of a request for discovery on a selective [enforcement] claim, a defendant must produce some evidence that the decisionmakers in his case acted with discriminatory purpose.") (quoting *United States v. Barnes*, 532 F. Supp. 2d 625, 637 (S.D.N.Y. 2008)) (second alteration in original) and citing *McClesky*, 481 U.S. at 292); *see also Cousins*, 2014 WL 5023485, at *5 (quoting identical language); *United States v. Alexander*, No. 11 Crim. 148 (AJS), 2013 WL 6491476, at *5 (N.D. Ill. Dec. 10, 2013) (same). Here, while Defendant cites statistics that he claims "evidence[] the discriminatory conduct of law enforcement in this [d]istrict," (Mem. at 15), Defendant has not alleged any facts or cited any evidence to support an inference that the agents "in *his* case acted with discriminatory purpose." *McClesky*, 481 U.S. at 292.

Because the statistics Defendant cites are not sufficient to "support a reasonable inference of discriminatory intent," he has also failed to meet the *Washington* standard. 869 F.3d at 221. For similar reasons, Defendant has failed to meet the *Davis* standard. Here, unlike in *Davis*, Defendant has not proffered any evidence that "the [DEA] and ATF would not have pursued this investigation had [Defendant] been white." 793 F.3d at 722. Nor has Defendant proffered any other evidence creating a "reason to believe that race played a role in the investigation" of his case. *Id.* Thus, Defendant has not shown evidence of discriminatory effect or intent necessary to warrant the discovery he seeks.

B.   **An Order Compelling the Government to Meet its Discovery Obligations is Not Warranted**

In addition to the discovery on his selective enforcement claim, Defendant also seeks to compel the government to produce evidence regarding the DEA and ATF's "targeting of Mr. Garcia-Pena" in 2016 and his alleged participation in a firearm sale that same year. (Mem. at 19.) Defendant argues that this evidence must be disclosed pursuant to Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963) because it "will support his defense that he was targeted and entrapped by the DEA/ATF." (Mem. at 20.)

Under Rule 16, "[u]pon a defendant's request," the government must, among other things, "permit the defendant to inspect and copy" an item "within the government's possession custody or control" if it is "(i) material to preparing the defense; (ii) if the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). Under *Brady*, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citation omitted).

However, "[c]ourts in this [c]ircuit have repeatedly denied requests for discovery orders" where "[t]he [g]overnment represents . . . that it has produced discovery to . . . defendants pursuant to Rule 16 . . . and has made a good faith representation to the defense that it recognizes and has complied with its obligations under *Brady* and [its progeny]." *United States v. Mason*, No. 06 Crim. 80 (NRB), 2007 WL 541653, at *6 (S.D.N.Y. Feb. 16, 2007) (collecting cases).

Here, Defendant acknowledges that "the [g]overnment has produced . . . two videos of the alleged firearm sale." (Mem. at 20 (citing Decl. of Cory Omer dated July 27, 2018, ECF No. 41, ¶ 3).) The government represents that it is "aware of its obligations under Rule 16 and *Brady*,"

that it "continues to search files related to" the firearm sale, and that it "will promptly produce any additional discoverable materials that it uncovers." (Opp'n to Def.'s Mot. to Dismiss ("Opp'n"), ECF No. 44, at 16.) In light of the prior production and representations by the government that it will comply with its discovery obligations, an order compelling compliance with those obligations is not warranted.

## IV. CONCLUSION

Defendant's motion to dismiss the Indictment and compel discovery, (ECF No. 37), is DENIED. The Clerk of Court is directed to close the motion accordingly.

Dated: New York, New York
      December 19, 2018

SO ORDERED.

GEORGE B. DANIELS
United States District Judge